**UNITED STATES of America,**

v.

**Leon CRADDOCK, Appellant.**

No. 92–1254.

United States Court of Appeals, Third Circuit.

Argued Nov. 5, 1992.

Decided May 14, 1993.

Robert P. Fulton (argued), Glenside, PA, for appellant.

Michael M. Baylson, U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Roland B. Jarvis (argued), Asst. U.S. Atty., Philadelphia, PA, for appellee.

Before: BECKER, STAPLETON and LAY,* Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Defendant-appellant Leon Craddock, a teller responsible for paying out Western Union money orders, was sentenced to 37 months imprisonment for his role in a conspiracy to commit credit card fraud. He challenges the calculation of his sentence based on the district court's finding that he abused a position of trust within the meaning of Section 3B1.3 of the United States Sentencing Guidelines. We will affirm the sentence.[1]

### I.

Leon Craddock was one of twelve defendants named in a twenty-two count Indictment charging conspiracy to commit credit card fraud and unauthorized use of access devices, in violation of 18 U.S.C. §§ 1029(b)(2) and 1029(a)(2), and aiding and abetting, in violation of 18 U.S.C. § 2. All defendants pleaded guilty to the conspiracy charge, which involved a scheme of using the information from discarded credit card carbons to conduct Western Union wire transfers without the knowledge of the owner of the credit card. Craddock's co-conspirators would dig through dumpsters until they found carbons, then call Western Union and use the information to wire money to a fabricated name. They would pick up the money by going to a Western Union location and presenting false identification in that name.

Leon Craddock was a teller at the Financial Exchange Company in Philadelphia, an office that processed and paid out Western Union wire transfers. The tellers were supposed to take steps to protect against fraudulent transactions. After a customer filled out a "to receive money" form, they were required to check the customer's identification and signature. It was also standard practice to photograph customers with a "Regiscope"; the proper documentation would be stamped with a Regiscope number, and the film would be filed away and developed later if a question arose about the transaction. After this verification procedure, the customer would receive money by endorsing a "money transfer" check which would be countersigned by the teller.

Craddock and two other tellers joined the conspiracy after it had been underway for more than a year. Rather than guard against fraudulent transactions, they agreed to pay out wire transfers to the conspirators, who were thus relieved of the burden of producing false identification for each pickup. In exchange, the tellers received a 10% commission on each transaction. Documentary evidence showed that Craddock engaged in ninety such transactions; the form for each was stamped with a Regiscope number but there was no corresponding photograph. In the approximately thirteen months before Craddock and his co-workers joined the conspiracy, there were nineteen fraudulent

---

* Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. Craddock also asserts that the district court erred because it failed to recognize its authority to depart downward from the Sentencing Guide-

lines. We reject this argument because the record indicates that the court was aware of its authority but chose not to exercise it. *See United States v. Georgiadis,* 933 F.2d 1219, 1222 (3d Cir.1991).

transactions; in the approximately eight months after they joined, there were 163 transactions.

The main issue at Craddock's sentencing hearing was whether he was subject to an increase in his offense level under U.S.S.G. § 3B1.3 for abusing a position of trust. The presentence report prepared by the Probation Office concluded that he was not, but the district court held otherwise. With the two level increase under § 3B1.3, the court calculated a total offense level of 14 and sentenced *Craddock to 37 months imprisonment,* the lowest term allowable given Craddock's criminal history category of 6.[2] We have jurisdiction to review this final decision pursuant to 28 U.S.C. § 1291 and, because this appeal involves the application of the Sentencing Guidelines, 18 U.S.C. § 3742.

## II.

### A.

■ Section 3B1.3 of the Sentencing Guidelines provides for an upward adjustment of a defendant's offense level for abuse of a position of trust. It states in relevant part:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.

U.S.S.G. § 3B1.3. The first Application Note attempts to illuminate the scope of the section:

> The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller.

§ 3B1.3, Application Note 1. The rationale for increased punishment is that an insider who takes advantage of a position of trust to facilitate a crime is thought to be more culpable than one who simply commits the offense. § 3B1.3, Background.

■ In applying the section a sentencing court must determine whether a defendant was placed in a position of trust, and if he was, whether he abused that position in a way that significantly facilitated his crime. The first question approaches a purely legal determination and is reviewed *de novo. United States v. McMillen,* 917 F.2d 773, 775 (3d Cir.1990). The second question more closely resembles a question of fact and is reviewed for clear error. *Id.*

■ Craddock argued to the district court, as he argues on appeal, that § 3B1.3 does not apply to him because his offense was similar to "an embezzlement by an ordinary bank teller," which the Application Note advises is not covered by the section. The district court addressed this argument by comparing Craddock's conduct to two methods of embezzlement that could be employed by an ordinary bank teller. The first involved simply taking money from the teller's drawer; the second involved taking kickbacks for paying out funds to an accomplice who made unauthorized withdrawals from the business account of the accomplice's employer. The court distinguished these schemes from Craddock's because they were easily detectable. Skimming from the till would be obvious to the bank when the teller's drawer did not balance for the day, the court reasoned, and the accomplice scheme would be detected by the internal auditing procedures of the defrauded employer. In contrast, the fraudulent wire transfers could not be detected by balancing because Craddock paid out the full amount of each transfer. The court reasoned further that individual credit cardholders were less likely than a defrauded business to trace the scheme back to the culprits. Based on the difficulty of detecting Craddock's offense and the substantial increase in fraudulent transactions after he and his coworkers joined the conspiracy, the court concluded that Craddock held a position of trust and abused it in a manner that significantly facilitated the conspiracy.

**2.** The court also imposed a two-year term of supervised release, restitution in the amount of $2,000, and a special assessment of $50.

## B.

We reach the same conclusion as the district court but arrive there by somewhat different reasoning. We perceive little material difference, either in terms of the conduct involved or the means of detecting that conduct, between Craddock's role in the wire transfer conspiracy and that of the "ordinary bank teller" of the district court's hypothetical who pays funds to an accomplice making unauthorized withdrawals. We believe, however, that neither scheme is exempt from scrutiny under § 3B1.3.

As noted, by its terms the section applies to one who occupied a position of trust and abused that position in a manner that significantly facilitated the commission or concealment of an offense. According to the Application Note, an offense is not "significantly facilitated" by an abuse of a position of trust if the position "merely ... provided an opportunity that could as easily have been afforded other persons"; thus, the adjustment "would not apply to an embezzlement by an ordinary bank teller." U.S.S.G. § 3B1.3, Application Note 1.[3]

This court has considered the meaning and scope of the section and its commentary in recent opinions. In *United States v. McMillen,* 917 F.2d 773 (3d Cir.1990), a branch manager of a savings and loan association misapplied funds by obtaining loans for himself in a fictitious name. Defendant collateralized the loans with a savings certificate he issued in the fictitious name; he also opened a checking account in that name and, after approving the fraudulent loans himself, deposited the proceeds in that account. As the scheme revealed, defendant had the authority to approve loan applications, issue savings certificates, and sign bank documents without supervisory approval. Noting the absence of evidence reflecting material limitations on this authority, we found it clear that he occupied a position of trust. *Id.* at 774–75.

Turning to the significant facilitation prong of § 3B1.3, we found that defendant had abused his position in a manner that significantly facilitated the offense because, pursuant to his authority, he personally and without supervision approved the documents that enabled his scheme to be successful. We rejected, as unsupported by the record, the district court's conclusion that the hypothetical ordinary bank teller spoken of in the Application Note could have undertaken a similar scheme of embezzlement and cover-up. We found it clear that defendant had greater authority than the normal bank teller and that this authority contributed substantially to both the commission and concealment of his crime. *Id.* at 776 & n. 4.

We again considered § 3B1.3 in *United States v. Lieberman,* 971 F.2d 989 (3d Cir. 1992), which involved a bank vice president who, in the exercise of his unsupervised authority to balance a loan account, made repeated transfers from the bank's account into his own over a four-year period. In assessing whether defendant occupied a position of trust, we approved of the statement of the Ninth Circuit in *United States v. Hill,* 915 F.2d 502 (9th Cir.1990), that "the primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *Lieberman,* 971 F.2d at 993 (quoting *Hill,* 915 F.2d at 506). We recounted that circuit's reasoning that a trust relationship is unlikely to exist if an attempt by a defendant to abuse his position would be readily detected by the other party; however, "if one party is able to take criminal advantage of the relationship without fear of ready or quick notice by the second party, the second party has clearly placed a level of trust in the first." *Id.* (quoting *Hill,* 915 F.2d at 506). This latter description fit defendant Lieberman. Unlike an ordinary bank teller whose accounts must balance each day and who is under frequent

---

**3.** The statute governing sentencing under the Guidelines instructs that a court "shall consider any pertinent policy statement issued by the Sentencing Commission ... that is in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(5). The Guidelines provide that the commentary is to be treated as the legal equivalent of a policy statement; both may be helpful in interpreting a section and determining how it was intended to be applied. U.S.S.G. § 1B1.7. Of course, it is the text that is binding, and we would follow the text over the commentary in the event of conflict.

surveillance, Lieberman was the sole person responsible for balancing and otherwise overseeing the account from which he embezzled. The position enabled him to commit a difficult-to-detect wrong, and it followed that he occupied a position of trust. *Id.*

As for significant facilitation, we concluded that the apparent ease with which Lieberman committed and concealed his embezzlement indicated the requisite nexus between his position of trust and the offense. Even if, as Lieberman asserted, forty other vice presidents could have committed such an offense, that did not mean that his position merely provided "an opportunity that could as easily been afforded to other persons." *See* U.S.S.G., § 3B1.3, Application Note 1. It was clear that relative to others who could commit bank embezzlement, Lieberman had exploited a position that was instrumental in enabling the offense. Thus, his position had significantly facilitated the offense within the meaning of § 3B1.3. 971 F.2d at 993–94.

Our most recent consideration of § 3B1.3 appears in *United States v. Brann*, 990 F.2d 98 (1993), a case involving an agent of the Virgin Islands Narcotics Strike Force who was given money for drug purchases he said he had arranged; the agent actually faked the transactions, turned in spurious drug mixtures, and kept the money. The agent argued against the application of § 3B1.3 on the ground that he held a low-level, non-supervisory position akin to that of a bank teller. However, following the line of inquiry employed in *Lieberman*, we considered the agent's authority and the acts it enabled. These included setting up drug buys without surveillance from other law enforcement officials, obtaining large sums of money from the Force on his representation that he had arranged the buys, and employing a third party to assist him. By permitting such conduct, the agent's position afforded him the freedom to commit a difficult-to-detect wrong. It also significantly facilitated the offense; as in *Lieberman*, the apparent ease with which defendant carried out his scheme showed the nexus between the position and the offense.[4]

The foregoing cases demonstrate that one has been placed in a position of trust when, by virtue of the authority conferred by the employer and the lack of controls imposed on that authority, he is able to commit an offense that is not readily discoverable. In such circumstances, the employer, by choice or necessity, is relying primarily on the integrity of the employee to safeguard against the loss occasioned by the offense. Applying this standard in *McMillen*, we focused directly on defendant's authority and the lack of supervisory checks on that authority. In *Lieberman* and *Brann*, we assessed the same factors by asking whether the employer had put the defendant in a position to commit a difficult-to-detect wrong. It is the position's authority and the lack of checks imposed on it that determine whether one has been put in a position to commit a difficult-to-detect crime and, thus, whether the employer is relying on the employee's integrity to protect against the loss occasioned by the crime.

An offense has been "significantly facilitated" by a position of trust when the trust aspects of the position make the offense substantially easier to commit or conceal.[5] In advising that § 3B1.3 would not apply to "an embezzlement by an ordinary bank teller," the first Application Note indicates that a crime generally is not significantly facilitated by a defendant's position if the position does no more than provide access to the victim or its property. We believe the Sentencing Commission had in mind the typical case of bank teller embezzlement discussed in *Hill* and *Lieberman*—physically skimming from the till. Regardless of the teller's total authority, the link between the position and the

---

4. This court also considered § 3B1.3 in *United States v. Georgiadis*, 933 F.2d 1219 (3d Cir.1991), where we affirmed with little discussion the district court's finding that an assistant vice president in the mortgage department of a bank, who diverted mortgage settlement monies into his own accounts and then altered the settlement records, occupied a position of trust and was subject to § 3B1.3.

5. In *Lieberman* and *Brann*, we stated that the apparent ease with which the offense was committed showed the requisite nexus between the position and the offense. These terms of analysis apply equally well to the facts of *McMillen*, where defendant was able to give himself fraudulent loans because his position enabled him to approve loan documents without supervision.

offense is only that the position gives the teller the opportunity to handle money and thereby to take what passes through his hands. Given the effectiveness of auditing and surveillance, the crime and its concealment are not significantly easier for the teller than for anyone else with access to the bank's cash.

Although on its face the Application Note addresses the significant facilitation requirement, courts have looked to it for guidance concerning the meaning of position of trust, as well. When a teller handles cash under the watchful eye of a supervisor and is subject to a daily audit, there is no trust aspect to the authority he or she exercises; in this situation, the bank is not relying on the teller's personal integrity to avoid the loss occasioned by skimming from the till. Thus in *Hill,* the court observed that routine auditing and surveillance make skimming so easy to detect that an embezzling teller would not be considered to have been put in a position of trust.[6] Similarly, in *McMillen* and *Lieberman,* we noted that defendants were able to commit their crimes because they possessed greater authority and were subject to less monitoring than the ordinary bank teller.

■ That an ordinary bank teller could not have duplicated the criminal conduct in *McMillen* and *Lieberman,* however, does not mean that a teller cannot under any circumstances occupy a position of trust. The presence of the independent requirement of significant facilitation implicitly recognizes that a job may have trust and non-trust aspects. The ordinary bank teller, when engaged in the activity of taking cash from the till or putting it in, is not utilizing a position of trust. The same teller, however, may engage in other activities in the course of his job that do involve aspects of trust, and these may be exploited to facilitate a crime. The critical inquiry under § 3B1.3 is thus not whether a defendant was termed a "teller" or lacked supervisory or managerial authority as most tellers do.[7] Rather, the standard for tellers, as for clerks, mechanics, and all other defendants, is (1) whether the authority conferred and the absence of controls indicate that the employer relied on the integrity of the defendant to protect against the loss occasioned by the crime; and (2) whether the trust aspect of the job made the commission or concealment of the crime significantly easier.

In this case, Craddock's employer had given him the authority to verify the identity of those requesting payouts. The payouts he made to his various accomplices were not detectable by way of the routine auditing and surveillance that would normally detect simple embezzlement; indeed, all the fraudulent transactions appeared to be legitimate from the perspective of the Financial Exchange and Western Union.[8] Craddock's only argument is that an ordinary bank teller could have engaged in a similar scheme. As we have shown, this argument is premised on an erroneous interpretation of § 3B1.3. The key point is not whether Craddock was an "ordinary bank teller" or something like it, but whether he exploited the authority provided by his position and engaged in a scheme that was difficult to detect. It is clear that he did. It also is clear that his

---

**6.** The defendant in *Hill,* a truck driver who stole from his cargo of household items that were to be shipped overseas, was not subject to effective monitoring and thus was placed in a position of trust. 915 F.2d at 506.

**7.** Courts have consistently rejected the argument that persons in positions providing little or no supervisory or managerial authority cannot be placed in positions of trust. *See, e.g., United States v. Williams,* 966 F.2d 555 (10th Cir.1992) (military pay account technician); *United States v. Ajiboye,* 961 F.2d 892 (9th Cir.1992) (mail carrier); *United States v. Milligan,* 958 F.2d 345 (11th Cir.1992) (post office window clerk); *United States v. Hill,* 915 F.2d 502 (9th Cir.1990) (truck driver); *United States v. Zamarripa,* 905

F.2d 337 (10th Cir.1990) (babysitter); *United States v. Parker,* 903 F.2d 91 (2d Cir.), *cert. denied,* 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990) (security guard).

**8.** As noted, a Regiscope was often used to photograph persons who picked up money and the film could be developed later if the company had cause to suspect a problem with the transaction. A photograph of a customer, however, would seldom tell the company whether a teller was in league with that customer. Thus, although the Regiscope could aid the company in monitoring its customers, it does not appear from the record that the Regiscope provided an effective means of monitoring employees or was intended for this purpose.

role in ninety fraudulent transactions, deliberately paying out funds to impostors when he was supposed to be guarding against such fraud, made the scheme considerably easier and thus significantly facilitated the offense.

The district court properly imposed the upward adjustment mandated by § 3B1.3, and we will affirm its judgment.