UNITED STATES of America,
Plaintiff–Appellant,

v.

James Allen FERRIN, Defendant–
Appellee.

No. 92–50288.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1992.

Decided May 20, 1993.

Melanie K. Pierson, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellant.

Thomas H. Senters, San Diego, CA, for defendant-appellee.

Before: BROWNING, SCHROEDER, and FLETCHER, Circuit Judges.

FLETCHER, Circuit Judge:

The government appeals the sentence of James Allen Ferrin, who pleaded guilty to one count of aiding and abetting the illegal disposal of hazardous waste, on four grounds: 1) that the offense level should have been enhanced pursuant to U.S.S.G. § 2Q1.2(b)(1) for a discharge into the environment; 2) that the district court incorrectly applied U.S.S.G. § 2Q1.2(b)(4) when it adjusted the offense level upward only two levels instead of four for failure to have a permit; 3) that the offense level should have been enhanced pursuant to U.S.S.G. § 3B1.3 for abuse of a position of trust; and 4) that the district court failed to assess a fine as required by U.S.S.G. § 5E1.2(a). We vacate Ferrin's sentence and remand for resentencing.

## FACTS AND PROCEDURAL HISTORY

Ferrin, a civilian employee, was the supervisor of seven hazardous waste handlers at the 32nd Street Naval Station in San Diego, California. The facility he was in charge of, the Consolidation, Storage and Transfer Facility (the "CST"), is used to collect and store hazardous wastes generated by the navy while arrangements are made for civilian contractors to transfer them to a lawful disposal site. The navy had applied to the Environmental Protection Agency for a permit that would allow for the storage of hazardous waste at the CST. While the application was pending, the CST had "interim status," which allowed it to store hazardous wastes for up to one year, but did not allow waste to be treated or disposed of at the site.

After receiving a call from one of the hazardous waste handlers at the CST who said he had witnessed the illegal disposal of wastes, the Naval Investigative Service ("NIS") commenced an investigation, using the caller as a confidential informant. The informant tape-recorded conversations with Ferrin, including one on February 7, 1991 in which Ferrin instructed him to treat isocyanate,[1] a hazardous substance, by mixing it with another chemical so it "foamed out" and, if it didn't react properly, to pour the chemicals into a kitty litter-like absorbent and dump the mixture into the trash. A videotape made by the NIS shows Ferrin supervising the mixing of the chemicals in the open air facility as clouds of gas are emitted from a fuming drum. Because the isocyanate was visibly reacting, Ferrin directed that the drum be left overnight. The next day, Ferrin instructed a second waste handler to dump the drum of isocyanate and another drum of hazardous waste into the municipal dumpster outside the CST. The contents of the dumpster were to be picked up by trash collectors and taken to a local landfill that was not equipped to handle hazardous waste.

At this juncture, NIS investigators sealed off the area and conducted tests of the contents of the dumpster, which revealed the presence of various hazardous substances in addition to isocyanate. A cleanup operation ensued.

A federal grand jury returned an indictment charging Ferrin with three counts of disposing of, and in two of those counts, also treating, hazardous waste without a permit, in violation of 42 U.S.C. § 6928(d)(2)(A) and 18 U.S.C. § 2, and a fourth count of making false statements in violation of 18 U.S.C. §§ 1001 and 2. Under a written plea agreement, Ferrin agreed to plead guilty to count two, admitting that he had aided and abetted the illegal disposal of methyl isocyanate.

---

1. Isocyanate is apparently shorthand for methyl isocyanate, the hazardous substance that was identified in the subsequent investigation.

Ferrin explained to the court that he had done so in anticipation of an upcoming inspection by the San Diego County Health Department, because of his "very big workload," and because he "got lazy." (Excerpts of Record ("E.R.") at 33.)

The probation department, in its presentence report, calculated Ferrin's offense level under U.S.S.G. § 2Q1.2, "Mishandling of Hazardous or Toxic Substances or Pesticides; Recordkeeping, Tampering, and Falsification," which has a base offense level of 8. The report recommended a six-level increase for an ongoing or repetitive discharge, release, or emission of a hazardous substance into the environment and a four-level increase for disposal without a permit, both specific offense characteristics under U.S.S.G. § 2Q1.2. In addition, the report recommended adjusting upward three levels for Ferrin's role in the offense pursuant to U.S.S.G. § 3B1.1(b) due to his managerial position at the CST, and subtracting two levels for acceptance of responsibility in accordance with U.S.S.G. § 3E1.1, for a final offense level of 19. The probation department recommended that no fine be imposed since it appeared Ferrin would "not be able to meet such a financial burden at this time." (Presentence Report at 10.)

At the sentencing hearing, the government argued for a four-level increase for Ferrin's role in the offense and an additional two-level upward adjustment for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3. In keeping with its plea agreement, the government also recommended a four-level downward departure for Ferrin's cooperation and sentencing at the low end of the guideline range.

As reflected in the transcript of the sentencing hearing, the court determined section 2Q1.2 to be the appropriate guideline and set the base offense level at 8. Rejecting the government's view, the court concluded that there had been no discharge into the environment and declined to increase Ferrin's offense level on that basis. It enhanced the offense level by four for Ferrin's supervisory role in the mishandling of the hazardous waste, but added only two points rather than the four specified in subsection (b)(4) for failure to have a permit. Without giving its reasons, the court rejected an abuse of trust enhancement. Finally, the court subtracted two levels for acceptance of responsibility and departed downward four levels for cooperation, arriving at an ultimate offense level of eight, which carries a guideline range of two to eight months for a person with a criminal history category of I.[2]

The court sentenced Ferrin within the guideline range to three months home detention during hours when Ferrin was not working and three years probation. As a condition of probation, Ferrin cannot be employed as a toxic or hazardous waste handler. The court also imposed 240 hours of community service and ordered Ferrin to pay the mandatory $50 penalty assessment. It declined to impose a fine.

The government has timely appealed Ferrin's sentence.

## JURISDICTION

The district court exercised original jurisdiction of the case under 18 U.S.C. § 3231. This court has jurisdiction of the government's appeal of Ferrin's sentence pursuant to 18 U.S.C. § 3742(b) and 28 U.S.C. § 1291.

---

**2.** The sentencing form attached to the court's judgment is inconsistent with the court's rulings at the sentencing hearing as catalogued above. The sentencing form indicates that the court determined the applicable offense level to be 16, but departed downward four levels due to Ferrin's cooperation with the government and an additional four levels because it considered the case to be a "very unusual" one in that Ferrin had been "singled out as the responsible person [while h]is superiors ... were responsible." (Certified Record 21 at 4.) The parties are in apparent agreement that the court's remarks at the sentencing hearing reflect the actual calculations made by the court, and we therefore treat them as controlling. We note that at the hearing, the court gave no indication that it was departing downward on any ground other than cooperation.

Although at the hearing the district court assigned a criminal history category of II, the government notes that this was in error and that Ferrin's criminal history category was actually I. The court in fact sentenced Ferrin relying on criminal history category I.

## DISCUSSION

### A. Discharge Into the Environment

The government first contends that Ferrin's offense level should have been enhanced under U.S.S.G. § 2Q1.2(b)(1) because Ferrin was responsible for the "discharge, release, or emission" of a hazardous substance into the environment. A single discharge carries a four-level increase, while an ongoing or repetitive discharge calls for a six-level increase. The district court found there had been no such discharge, explaining that it didn't perceive "any evidence nor did [Ferrin] plead to dumping it into the dumpster. Likely that's where it went and likely the dumpster was going to go to the Miramar landfill, but that's as far as I'm going to go." (Supplemental Excerpts of Record ("S.E.R.") at 57.) The court did not address the clouds of gas that were emitted from Ferrin's concoction and captured on videotape, although the tape was submitted by the government for the court's consideration.

■ We review the district court's interpretation of the Sentencing Guidelines de novo, *United States v. Robinson*, 967 F.2d 287, 293 (9th Cir.1992), and its factual findings in connection with sentencing for clear error. *United States v. Chapnick*, 963 F.2d 224, 226 (9th Cir.1992). Under the clearly erroneous standard of review, we must accept the trial court's findings of fact unless we are left with the definite and firm conviction that a mistake has been committed. *United States v. Ramos*, 923 F.2d 1346, 1356 (9th Cir.1991).

■ Ferrin pleaded guilty to the illegal disposal of hazardous waste. The Solid Waste Disposal Act under which Ferrin was convicted defines "disposal" as the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof *may enter* the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3) (emphasis added). Because the statute contemplates that a defendant may be guilty of hazardous waste disposal even if the hazardous substance did not actually enter the environment, we do not agree with the government that in pleading guilty, Ferrin necessarily admitted a discharge into the environment. Rather, under the terms of the statute, his admission was that he disposed of a hazardous waste in such a fashion that it *could* enter the environment.

Contrary to the district court's finding that the evidence did not support a finding that the isocyanate ended up in the dumpster, there was compelling evidence that that was exactly what happened. Ferrin admitted during the plea proceeding that he directed an employee to discard the mixture in "the dump, the trash" with the understanding that it would be picked up by municipal sanitation workers. (E.R. 32–33.) The fact that Ferrin did not place it in the dumpster himself was irrelevant, since he pleaded guilty as an aider and abettor. An aider and abettor is punishable as a principal. 18 U.S.C. § 2.

■ The more difficult question is whether Ferrin's activities can be said to have caused a discharge into the environment within the meaning of subsection (b)(1). Application note 5 to section 2Q1.2 provides some (albeit somewhat amorphous) guidance on this point:

> Subsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination. A wide range of conduct, involving the handling of different quantities of materials with widely differing propensities, potentially is covered. Depending upon the harm resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation, a departure of up to two levels in either direction from the offense levels prescribed in these specific offense characteristics may be appropriate.

U.S.S.G. § 2Q1.2 application note 5. We are obligated to consider this commentary in construing the guideline. *United States v. Anderson*, 942 F.2d 606, 612 (9th Cir.1991).

At the outset, we note that although the application note appears to speak of environmental contamination in connection with both parts of subsection (b)(1), only subsection (b)(1)(A), which treats repetitive discharges,

actually specifies that the discharge, release or emission be "into the environment." Since application note 5 treats both subsections as though they contained the same discharge requirement, however, we do so as well.

Two circuits so far have addressed in published opinions the relationship between application note 5 and subsection (b)(1). In *United States v. Bogas,* 920 F.2d 363 (6th Cir.1990), the commissioner of Cleveland Hopkins International Airport ordered the burial of paint drums at the end of an airport runway. When the pit was excavated, it was found to contain over 100 drums. *Id.* at 365. The excavation site emitted noxious vapors and there was visible discoloration of the soil, although, apparently due to the presence of a layer of sand which acted as a filter, no contamination of drinking water was found. *Id.* at 365–66. Bogas was convicted of failing to report the release of hazardous wastes into the environment and making a false statement about the release in violation of 42 U.S.C. § 9603(b)(3) and 18 U.S.C. § 1001. In analyzing application note 5 to U.S.S.G. § 2Q1.2, the court held that since there was visual contamination of the soil and "there must have been some water contamination even if the fortuitous presence of the nearby foundry sand filter prevented any possible damage to anyone's water supply," it would be clearly erroneous to have found no actual environmental contamination. *Id.* at 368. Therefore, the court concluded, Bogas' sentence was correctly enhanced under subsection (b)(1).

The Fifth Circuit examined application note 5 in *United States v. Sellers,* 926 F.2d 410 (5th Cir.1991). In that case, Sellers had been found guilty of disposing of sixteen drums containing methylethylketone, a hazardous waste, by depositing them on an embankment of a creek in violation of 42 U.S.C. § 6928(d)(2)(A). Despite Sellers' argument that the waste had been discovered just one day after it had been dumped and that there was little likelihood that it had actually contaminated the environment, the court held that an enhancement under subsection (b)(1) was proper based on the fact that one drum had been leaking, if only for one day. *Id.* at

418. *Sellers,* then, like *Bogas,* focused on whether there had been a finding of actual contamination to support the subsection (b)(1) adjustment.

The Fifth Circuit addressed the issue again in *United States v. Goldfaden,* 959 F.2d 1324 (5th Cir.1992). In this case, the defendant pleaded guilty to one count of discharge of industrial waste in violation of 33 U.S.C. § 1319(c)(2)(A). The district court added six levels to Goldfaden's sentence for repetitive discharge under subsection (b)(1) on the basis of an EPA agent's testimony that there had been repeated illegal dumping of wastewater into the Dallas sewer system. Goldfaden argued that without a finding of actual environmental contamination, the district court's increase for repetitive discharge was improper. The Fifth Circuit rejected this argument, and held that proof of actual environmental contamination was not required to adjust Goldfaden's offense level upward pursuant to subsection (b)(1):

> [W]e interpret [application note 5] to explain that subsection (b)(1) takes environmental contamination as a given, but allows for upward or downward departures depending on the potency, size, or duration of the contamination. The absence of proof of actual environmental contamination, in this case, therefore, does not affect the propriety of the district court's enhancement for repetitive discharges.

*Id.* at 1331.

■ We agree with the Fifth Circuit's reasoning here insofar as it applies to a defendant such as Goldfaden who is guilty of illegal discharge of industrial waste; such an offense necessarily embraces a contaminating environmental discharge. Other types of offenses covered by section 2Q1.2, such as the illegal hazardous waste disposal engaged in by Ferrin, however, may or may not result in de facto environmental contamination. In view of the "actual contamination" language of application note 5, we conclude that an enhancement under subsection (b)(1) requires a showing that some amount of hazardous substance in fact contaminated the environment.

■ Proof of environmental contamination does not necessarily require a full-blown scientific study. We see no reason why in most cases reasonable inferences from available evidence concerning the offense at issue would not suffice to support a conclusion that the illegal acts resulted in contamination. "Contaminate" is not defined in the Solid Waste Disposal Act, but in common English it means "to soil, stain, or infect by contact or association" or "to make ... impure by admixture." *Webster's New Collegiate Dictionary* 245 (1977). "Environment" is not defined in the Act either, but the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), another statute designed to ameliorate pollution, defines it in pertinent part as "surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States." 42 U.S.C. § 9601(8). Thus a finding that the hazardous waste came into contact with land or water or was released into the air is the appropriate predicate for an enhancement under subsection (b)(1). Even a small amount of hazardous discharge may suffice for an upward adjustment although, pursuant to application note 5, the district court retains the authority to depart two points in either direction depending upon the amount of harm to the environment, the quantity discharged, the nature of the substance involved, and the duration of and risk associated with the offense.

■ Ferrin's disposal of the isocyanate mixture in the dumpster was reprehensible because he threatened the health and safety of all who came or would come in contact with it, directly during the course of removing it to the dumpster and transporting it to the dump, or indirectly as a result of soil or water contamination. Nonetheless, because, owing to the fortuitous intervention of the authorities, there was no actual contamination, the district court was correct in refusing to enhance Ferrin's sentence on this basis. Ferrin was lucky that the probable consequences of his actions did not come to pass.

■ The district court did err, however, in failing to make appropriate findings concerning the gas that was released into the air

as a result of Ferrin's direction to combine the isocyanate with another chemical in preparation for dumping it in the dumpster. *See* U.S.S.G. § 1B1.3(a)(1) (court shall consider "all acts and omissions committed or aided and abetted by the defendant ... that occurred during the commission of the offense of conviction [or] in preparation for that offense" in determining specific offense characteristics). On remand, the court must consider whether the gas was a hazardous substance since, if it was, its escape into the atmosphere contaminated the environment, and an increase in Ferrin's offense level is warranted under subsection (b)(1).

### B. Lack of Permit

Subsection (b)(4) of U.S.S.G. § 2Q1.2 requires the sentencing court to increase the offense level by four levels "[i]f the offense involved transportation, treatment, storage, or disposal without a permit or in violation of a permit." Application note 8 treats subsection (b)(4). It states that the provision applies "where the offense involved violation of a permit, or where there was a failure to obtain a permit when one was required. Depending upon the nature and quantity of the substance involved and the risk associated with the offense, a departure of up to two levels either upward or downward may be warranted."

The district court determined that, even though Ferrin did not have a permit for hazardous waste disposal,

I'm not so sure of the fact that [Ferrin] did not have a permit is his fault. There again was it up to him to get the permit or was it up to the navy to get the permit or was it up to the civilian above him to get the permit? ... I suggest to you the people who are responsible ought to get the permit. If the navy can't store it, they got to dispose [of] it.

(S.E.R. at 57–58.) It was evidently based on this conclusion that the district court adjusted upward only two levels for failure to have a permit, rather than the four specified by the applicable offense characteristic.

■ The navy did not have a permit or interim clearance to dispose of hazardous wastes at the CST. Indeed, an element of

the offense to which Ferrin pleaded guilty, the illegal disposal of waste in violation of 42 U.S.C. § 6928(d)(2)(A), is lack of a permit. It does not matter whether he was aware that the navy did not have the required permit. *United States v. Hoflin,* 880 F.2d 1033, 1039 (9th Cir.1989), *cert. denied,* 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1047 (1990). We conclude that the district court was obligated to enhance the offense level pursuant to subsection (b)(4), although, with adequate justification and an appropriate finding, it could have departed downward from the four-level enhancement per application note 8.

■ We note, however, that the district court did not indicate that it intended to depart from the guideline and further, that a finding that the navy should have obtained a permit for disposal of hazardous waste is not a basis for departure under application note 8, which authorizes departure based on the nature and quantity of the hazardous substance that was improperly handled. On remand, the court should adjust Ferrin's offense level upward by four levels for failure to have a permit or make appropriate findings relying on bases authorized by application note 8 and accompanied by a "reasoned explanation" for departure from the prescribed four-level increase. *United States v. Lira–Barraza,* 941 F.2d 745, 751 (9th Cir. 1991).

### C. Abuse of Trust

■ The guidelines prescribe that the base offense level be enhanced "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.[3] In rejecting the government's position that such an enhancement was warranted, the district court simply stated, "That doesn't fly with me. This isn't an abuse of trust situation in my judgment." (S.E.R. at 58.)

■ Because the propriety of applying an abuse of trust enhancement is a mixed question of fact and law, the ruling of the district court is reviewed de novo. *United States v. Hill,* 915 F.2d 502 (9th Cir.1990). The critical inquiry is determining whether a person is in a position of trust is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *Id.* at 506. There are two factors to be considered: the inability of the trustor objectively and expediently to determine the trustee's honesty, and the ease with which the trustee's activities can be observed. *Id.*

■ Although Ferrin evidently was not a very high-ranking employee, as evidenced by his fairly modest pay,[4] this would not necessarily preclude a finding that he was in a position of trust. This circuit previously has held that a mail carrier who stole mail deserved the enhancement, *United States v. Ajiboye,* 961 F.2d 892, 895 (9th Cir.1992), as well as the driver of a moving truck who absconded with peoples' belongings since his activities "almost by definition, were difficult, if not impossible to observe," *Hill,* 915 F.2d at 507. Significantly, Ferrin admitted during his plea allocution that the illegal disposal of the isocyanate was part of a scheme to conceal violations at the CST in anticipation of an inspection by the county health department.

Because the district court did not make adequate factual findings on this issue, and because we are unable to discern whether it considered Ferrin's position and activities in light of relevant Ninth Circuit precedent, we remand for the court to consider whether Ferrin took advantage of his supervisory role at the waste facility to commit a difficult-to-detect wrong.

### D. Fine

After sentencing Ferrin to three months home detention and imposing 240 hours of community service, the court stated, "There is no fine. I figure the community treatment [sic] spread over a longer period of time is going to remind you enough of what you did wrong." (S.E.R. 62.) The court, however,

---

**3.** Because Ferrin's offense level was adjusted upward for his supervisory role pursuant to U.S.S.G. § 3B1.1, he cannot also receive an enhancement for abuse of trust based on his using a special skill. *See* U.S.S.G. § 3B1.3.

**4.** *See* note 5 *infra.*

made no finding concerning Ferrin's ability to pay a fine. We note that it appears from the probation report that although Ferrin is not destitute, his financial resources are limited.[5] The government urges that a fine should be imposed pursuant to U.S.S.G. § 5E1.2(a), which provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." *See also United States v. Rafferty*, 911 F.2d 227, 232 (9th Cir.1990) (quoting guideline).

 As the government correctly points out, the guidelines do not permit the substitution of community service for a fine. We therefore remand for an appropriate finding as to Ferrin's capacity to pay a fine. If Ferrin can pay one, the court must impose one.

**REMANDED** to the district court for reconsideration of Ferrin's sentence in light of this opinion.

---

**5.** The presentence report indicated that Ferrin had cash on hand in the amount of $1,200 and approximately $19,500 equity in his home, which was valued at $155,000. He and his wife owned two vehicles worth $3,200. Ferrin's monthly income in his position at the CST, from which he had been fired, had been $1,600, and his wife had income of $1,775 per month. (At the time of sentencing, Ferrin had found new employment as a maintenance man for $1,000 per month.) He and his wife had just had a child and had outstanding medical expenses totalling $5,000.