# UNITED STATES of America, Plaintiff–Appellee,

v.

## Constance Rita ISAACSON, Defendant–Appellant.

### No. 97–50155.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 10, 1998.

Decided Sept. 2, 1998.

Brian A. Newman, Culver City, CA, for defendant-appellant.

Tammy Spertus, Assistant United States Attorney, Los Angeles, CA, for plaintiff-appellee.

Before: FLETCHER, FERNANDEZ and RYMER, Circuit Judges.

Opinion by Judge FLETCHER; Dissent by Judge FERNANDEZ.

FLETCHER, Circuit Judge:

Constance Rita Isaacson appeals the sentence imposed after her conviction of misapplication of bank funds in violation of 18 U.S.C. § 656. She claims that the district court erred in enhancing her sentence for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3. We affirm.

## I.

For over thirty years, Isaacson worked for the Bank of America at five different locations in southern California. From January 1994 to June 1995, Isaacson worked as a vault teller at the Chino Hills branch. Her duties included waiting on merchants, counting bags in the bank's vaults and balancing the account sheets.

At the beginning of each work day, Isaacson's teller box contained $50,000, and at the end of the day she was responsible for balancing the box by placing 100 twenty-dollar

bills in plastic "poly-bags," which she was then to seal, date, badge stamp, initial and have initialed by a second person. After preparing the poly-bag bundle, she was to enter the amount of money in the bundle into a computer.

The Bank of America began investigating Isaacson after the Chino Hills branch reported that it was experiencing problems with missing funds and that Isaacson's teller box keys and account sheets were missing. This was discovered when a locksmith who had come to fix a doorknob at the branch was mistakenly told that there was a problem with Isaacson's teller box.

When confronted by a Bank of America investigator, Isaacson admitted that she had been stealing from the bank and signed a written confession. According to the investigator, Isaacson's involvement in the offense would inevitably have been discovered once her keys were noticed to be missing, but that the missing keys would probably have gone unnoticed were it not for the locksmith. Isaacson waived her *Miranda* rights and provided a written confession to the Federal Bureau of Investigation.

Pursuant to a plea agreement, Isaacson pleaded guilty to a one-count indictment of misapplication of bank funds in violation of 18 U.S.C. § 656. As part of the agreement, Isaacson admitted that she embezzled approximately $93,000 from January 1994 to June 1995. Isaacson embezzled the money by replacing 98 of the 100 twenty-dollar bills from her poly-bag bundle with one-dollar bills, leaving one twenty-dollar bill on top and one on the bottom of the bundle. She would then prepare the bundle as usual with the initials, date, seal and badge stamp, but would forge the second set of initials. She then balanced her box as if the poly-bag bundle contained the correct amount of money.

· Eventually, Isaacson would only date stamp and initial the poly-bag with her own initials and the forged set of initials without performing the other security procedures for the bundles. Although auditors would count her box, she was not questioned until the incident with the locksmith. Both the Branch Manager and Operations Officer were subsequently fired for not requiring Isaacson to follow all of the normal security procedures.

Isaacson's plea bargain stipulated to an offense level of 10, derived from a base offense level of 4, plus 8 levels for the specific offense characteristic of loss of more than $70,000, minus 2 levels for acceptance of responsibility. The Pre–Sentence Report recommended an additional upward adjustment of 2 levels pursuant to U.S.S.G. § 3B1.1 for abuse of a position of trust, suggesting that the Branch Manager and Operations Officer placed an "extraordinary amount of trust" in Isaacson, and that they allowed her to short-cut the security procedures because she was a "long time and highly trusted employee."

At sentencing, Isaacson objected to the upward adjustment for abuse of trust, arguing that she was only an ordinary bank teller working part-time and earning $640 per month, and that the bank had foregone its security measures on account of understaffing rather than any particular trust in her. However, the district court found that Isaacson was not an ordinary bank teller but "a head vault teller," and that she was "someone [upon] whom a great deal of trust was imposed." The district court sentenced Isaacson to five months in prison followed by three years of supervised release, including five months of home detention with electronic monitoring. Isaacson timely appealed.

## II.

■ Isaacson claims that the district court erred in applying the 2–level upward adjustment for abuse of a position of trust pursuant to U.S.S.C. § 3B1.3 to her sentence. "Because the propriety of applying an abuse of trust enhancement is a mixed question of fact and law, the ruling of the district court is reviewed de novo." *United States v. Ferrin,* 994 F.2d 658, 665 (9th Cir.1993) (citation omitted).

■ Section 3B1.3 provides that: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." The Guidelines further explain:

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment would not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3 (application note 1).

Pointing to the last sentence of the above-quoted passage, Isaacson argues as a preliminary matter that the terms of § 3B1.3 expressly cannot apply to her since hers was a case of embezzlement by an ordinary bank teller.

However, we agree with the Tenth and Fourth Circuits that the inquiry under § 3B1.3 is more complex than mere categorization of positions. *See United States v. Johnson*, 4 F.3d 904, 916 (10th Cir.1993) ("The guidelines look not only to the position of the defendant, but also to the acts committed to determine whether *this* defendant is 'more culpable' than others." (emphasis in original, citation omitted)); *see also United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995) ("The abuse of trust enhancement was not designed to turn on formalistic definitions of job type." (citing *Johnson* )).

In *Johnson*, the Tenth Circuit upheld the application of § 3B1.3 to a vault teller, noting

that she was responsible for receiving the delivery of cash directly from the armored car personnel and for counting and verifying each cash delivery, and that she carried the key to the vault. 4 F.3d at 916. Thus, the court concluded that the district court did not err in finding that "the bank entrusted her with responsibilities beyond those of the other tellers." *Id.*

This approach is consistent with our determination in *United States v. Christiansen* that an abuse of trust enhancement under § 3B1.3 requires more culpable conduct than a breach of trust and that the enhancement can only be applied to embezzlers "when the breach of trust was particularly egregious." 958 F.2d 285, 287 (9th Cir.1992).

Like the defendant in *Johnson,* Isaacson was entrusted with responsibilities beyond those of an ordinary teller. The district court found that she was head vault teller,[1] and that, on account of her lengthy service, Isaacson was not required to undergo all of the security checks that other tellers went through. By abusing this special position of trust, she was consequently able to embezzle funds and evade detection.

Isaacson argues that it was inept supervision that allowed her to commit and conceal her offense and not any special trust placed in her. In support of this argument she cites *United States v. Helton* for the proposition that "being subject to lax supervision alone does not convert one's job into a 'position of trust' under section 3B1.3." 953 F.2d 867, 870 (4th Cir.1992).

In *Helton,* the Fourth Circuit upheld the district court's decision not to apply an enhancement under § 3B1.3. *Id.* at 868–69. Helton was employed as a cashier at the National Institute of Standards and Technology and was responsible for giving employees traveler's checks and cash for job related travel and purchases. *Id.* at 868. Although Helton had no discretion in whether to issue funds, her supervisor never audited the traveler's check portion of the funds. *Id.* Helton was ultimately convicted of embezzling over $20,000 in traveler's checks. *Id.*

---

[1]. This characterization is found in the Pre–Sentence Report in describing her employment and is echoed by the district court. However, Isaac-son's counsel argued at the sentencing hearing that she was not head vault teller. Whether head vault teller or not, she clearly was a vault teller.

In upholding the decision not to apply § 3B1.3, the Fourth Circuit noted that "Helton's superiors would have quickly detected the embezzlement had they not been, as the district court found, 'inept,' 'sloppy,' and 'derelict in their duty.'" *Id.* at 869–70 (citations omitted). In addition, the Fourth Circuit noted that the Guidelines specify that the position of trust must "'not merely have provided an opportunity that could as easily have been afforded to other persons.'" *Id.* at 870 (quoting § 3B1.3 application note 1).[2] The district court, however, "found that the embezzled funds could just as easily have been picked off by another person." *Id.* (citation and internal quotation marks omitted). Thus, the Fourth Circuit concluded, the district court's decision not to apply the abuse of trust enhancement under § 3B1.3 was not erroneous. *Id.*

Helton is somewhat similar to Isaacson's case in that the firing of the Branch Manager and Operations Officer was in part due to their failure to enforce the full regimen of security procedures upon Isaacson. However, the district court, in addition to finding that their firing was "in part because of their trust in the defendant," found that Isaacson was a head vault teller-a position of trust. The Pre–Sentence Report noted Isaacson's special duties as a vault teller and stated that "the defendant's position of trust indeed contributed in a significant way by making the detection of the offense more difficult."

Finally, Isaacson argues that her case is controlled by *United States v. Hill*, 915 F.2d 502 (9th Cir.1990), in which we interpreted the reach of § 3B1.3 with respect to whether a truck driver hauling household goods was in a position of trust. The *Hill* court, in explaining why he was in a position of trust, contrasted his position with that of an ordinary bank teller whose embezzlement is easily detected because she can be seen at all times and because she is personally responsible at the end of the day for any shortfall in her drawer. *Id.* at 505.

Isaacson argues that, since all her supervisors need have done was check her poly-bag bundles to discover the embezzlement, § 3B1.3 should not apply. However, as noted by the Bank of America investigator, Isaacson's shortfalls under the procedures applied to her were neither detected nor detectable at the end of the day but for the happenstance with the locksmith. Nor was she under constant surveillance like an ordinary bank teller.

As we explained in *United States v. Cuff*, *Hill* stands for the proposition that "the critical inquiry is 'the extent to which the position provides the freedom to commit a difficult-to-detect wrong.'" 999 F.2d 1396, 1397 (9th Cir.1993) (quoting *Hill*, 915 F.2d at 506). Accordingly:

> If one party to the employment relationship is able to take advantage of that relationship to commit a criminal act that will not be readily noticed, that person occupies a position of trust, but if any attempt to abuse the employment relationship is readily noticed by the other party to the relationship, the relationship is not one of trust.

*Id.* (citation omitted). Isaacson was able to take advantage of her position of trust as vault teller to embezzle funds without notice by her supervisors over an extended period of time and in a substantial amount.[3] Thus, the enhancement under § 3B1.3 was properly applied to her sentence.

AFFIRMED.

FERNANDEZ, Circuit Judge, dissenting:

As a prelude to what follows, I must confess that the intuitions of the district court judge and those of my colleagues seem sensible and correct. I can muster the temerity

---

**2.** Until it was replaced in 1993 with the text quoted above, application note 1 stated: "The position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller."

**3.** The dissent suggests that the Bank of America as a corporate entity, rather than Isaacson's immediate supervisors, was her employer for the purposes of an enhancement under § 3B1.3. Dissent at p. 1089. However, institutions can act only through people. The Branch Manager and Operations Officer defined the job Isaacson actually performed and made that job a position of trust through which she was able to embezzle $93,000 over a year and a half period.

to dissent only because I am convinced that those good intuitions have not been enshrined in the Guidelines.

I agree with Isaacson that, although she was trusted, she was not in a position of trust. We recognized that distinction in *United States v. Oplinger*, 150 F.3d 1061, 1068 (9th Cir.1998), where we stated that "[w]hether an individual is personally trusted is irrelevant to the § 3B1.3 analysis...."

There was nothing very special about Isaacson's position with the bank. She was a part-time vault teller, that is all. The bank had systems in place to check on her performance. However, because the bank's branch manager and operations officer trusted her, they did not require her to complete the security procedures that her employer, the bank, had instituted. As a result, she developed a simple scheme for peculating funds—the well known false wad. At the end of the day, she was required to place one hundred $20 bills in a "poly bag," then seal the bag, date it, initial it, and obtain the initials of a second employee who had observed the process. Instead, she put one $20 bill on each side of a wad of $1 bills, which, of course, looked fine from the outside. She then did the sealing and initialling, and often forged someone else's initials also.

Her managers' lack of enforcement of the bank's rules allowed her to get away with that for a long time until, finally, her embezzlements were accidentally discovered. The branch manager and the operations officer lost their jobs when that occurred because of their incompetence in not enforcing the protective rules which surrounded Isaacson's relatively lowly position with the bank.

In creating the Guidelines, the Sentencing Commission no doubt perceived that a person who violates a trust may well do serious damage to the ties that bind us together in this complex society and may, therefore, be more reprehensible than, say, a pickpocket or a sneak thief. However, when it eschewed a more direct and broader statement of that perception—for example, "a defendant in whom trust is reposed"—for the more narrow "abused a position of ... trust," it had to explain that locution. It set out to do so, but it still fell short of making its pronouncement pellucid when it stated:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.,* substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

USSG § 3B1.3, comment. (n.1). That definition, with all of its modifiers, called for something more, so the Commission propounded a few examples. It said that the adjustment would apply to "embezzlement of a client's funds by an attorney serving as a guardian," or "a bank executive's fraudulent loan scheme," or "criminal sexual abuse of a patient by a physician under the guise of an examination." *Id.* However, said the Commission, it "would not apply in the case of an embezzlement or theft by an ordinary bank teller...." *Id.* Having thus delivered itself of those elucidations, it left the matter to the courts, which have taken up the assignment in a multitude of cases [1] as they have attempted to wrap words around what started out as a simple kernel of insight about culpability.

Our leading case on the subject adumbrated the considerations which must go into a decision. *See United States v. Hill*, 915 F.2d 502 (9th Cir.1990). In that case, some families, which were moving from this country to Germany, allowed Hill to pick up their personal possessions and household goods so that those could be transported to a seaport from which they would be shipped abroad. *Id.* at 504. Hill picked them up all right, but on the way to the seaport he opened the boxes of goods, stole some, and destroyed others. *Id.* When caught and sentenced, he was awarded a 2 point upward adjustment for breach of a position of trust, and he appealed. We declared:

---

**1.** The provision has been considered in about 182 published cases in the Courts of Appeals

alone.

[T]he primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong. If a person is in a relationship such that any attempt by a defendant to abuse the relationship could be simply or readily noticed by the second party to the relationship, presumably the two persons have not formed a "trust" relationship. Conversely, if one party is able to take criminal advantage of the relationship without fear of ready or quick notice by the second party, the second party has clearly placed a level of trust in the first.

*Id.* at 506. We went on to explain further that those reflections gave rise to two indicia of a position of trust. One was the "inability of the [victim] objectively and expediently to determine the [defendant's] honesty." *Id.* The other was "the ease with which the [defendant's] activities can be observed." *Id.*

Those comments did help. However, despite *Hill's* clarification of the guideline provisions, difficulties do remain. That has been demonstrated in our postal service cases. Of course, we all trust that the mail will not be pilfered by postal employees, and because nobody can be watched at all times, every postal worker must be trusted to some extent. But to what extent? There the inevitable line drawing begins.

In *United States v. Ajiboye*, 961 F.2d 892 (9th Cir.1992), we dealt with the theft of mail by a postal worker who took the mail that he was supposed to deliver. *Id.* at 893. He appealed the award of the two level upward adjustment for abuse of a position of trust. We affirmed and said:

[I]t is evident that a postal carrier who delivers ordinary mail is in a position of trust.... The Postal Service places ... faith in those it hires to carry and deliver the mail. The Service does not routinely spy or check up on its carriers as they swiftly complete their appointed rounds.... Instead, it trusts carriers to

resist the temptation to appropriate the contents of items of mail for themselves. Unlike the bank teller who is dutifully watched over by supervisors and who must account for all transactions at the end of the day, the postal carrier is free from surveillance when delivering mail and does not account in any way for particular pieces of ordinary mail.

*Id.* at 895. On the other hand, in *Cuff*, 999 F.2d at 1397, a postal worker was employed "to unload mail at a post office loading dock." He, too, appealed the award of a two level upward adjustment for abuse of a position of trust. We reversed and said:

[W]e fail to see any significant distinction between the bank teller who embezzles funds and Cuff, who stole mail packages while employed in unloading them and moving them into the workroom where other employees were located.... Although he was not under constant observation on the loading dock, and was permitted to load and to unload trucks by himself, postal inspectors can observe mail handlers at work on the dock from catwalks with concealed surveillance areas, and mirrors are placed in the work area to facilitate observation. These are not the trappings of a position of trust.

*Id.* at 1398.

These two cases nicely bracket the issue. Of course, nobody can be watched every second. But it is much easier to detect wrongdoing by some employees, and the detection systems in place are part of the determination of whether the employee has the "trappings of a position of trust." *Id.*[2] Further illumination can be sought in cases involving financial institution employees.

In *United States v. Christiansen*, 958 F.2d 285 (9th Cir.1992), we considered the case of a credit union branch manager, who embezzled funds from her employer. *Id.* at 286. She was responsible for supervising employees and for accounting for the branch's cash

---

**2.** I recognize that, notwithstanding its other statements about this guideline, the Commission has also issued its ukase that "because of the special nature of the United States mail an adjustment for an abuse of a position of trust will apply to any employee of the U.S. Postal Service

who engages in the theft ... of undelivered United States mail." USSG § 3B1.3, comment. (n.1), as adopted November 1, 1993. That does not change the analytical approach set forth in our postal employee cases.

and negotiable instruments. *Id.* We upheld an enhancement because, as we said, "Her position as a branch representative not only allowed her access to large amounts of cash, but also made it possible for her to conceal the theft for an extended period of time. In other words, her position of trust facilitated her embezzlement in a manner not accounted for in the underlying offense." *Id.* at 288. That does not define Isaacson because she decidedly was not a manager of a branch office. She was merely a part-time vault teller, who was subjected by her employer to a number of safeguards. Of course, the bank itself, rather than an on-site manager, was her employer. There is not a shred of evidence that the bank endowed her position with any special form of trust. Rather, from its standpoint as the victim of the offense, no significant trust was reposed in Isaacson. *See United States v. Barnes,* 125 F.3d 1287, 1292 (9th Cir.1997) (the nature of the position is to be considered from the standpoint of the victim). No doubt she was able to carry out and conceal her embezzlement, but in that respect she was much like the embezzler in *United States v. Helton,* 953 F.2d 867 (4th Cir.1992).

In *Helton,* an imprest fund cashier undertook the embezzlement of over $20,050. The district court did not impose the adjustment and the government appealed. It argued that she was in a position of trust because "her supervisor trusted her and did not audit the traveler's check fund." *Id.* at 869. That enabled her to peculate checks for almost a whole year before she was caught. *Id.* The Fourth Circuit affirmed and pointed out that "Helton's superiors would have quickly detected the embezzlement had they not been, as the district court found, 'inept,' 'sloppy,' and 'derelict in their duty.'" *Id.* at 869–70 (citations omitted). It went on to explain that "Helton obviously should have been closely supervised, but being subject to lax supervision alone does not convert one's job into a 'position of trust' under section 3B1.3." *Id.* at 870. That precisely describes Isaacson's relationship to the bank and to her superiors. The bank's strictures on her job made her simple crime easy to detect, and it

was only the ineptitude of her superiors that allowed her to get away with it for so long. That ineptitude was insufficient to convert her "job into a 'position of trust.'" *Id.* Were there any doubt, one need only consider the bank's reaction to her superiors' inaction; it relieved them of their jobs.

Nor does this analysis conflict with cases from other circuits, which have dealt with bank employees. In those cases, the employee's position had some special accouterments which could be seen as conferring more trust upon its holder. *See United States v. Gordon,* 61 F.3d 263, 269 (4th Cir.1995) (employee's position was one that gave her special access to bank security information, which she used to facilitate a robbery); *United States v. Johnson,* 4 F.3d 904, 916–17 (10th Cir.1993) (employee's position as a vault teller gave her special knowledge, which helped her to plan a bank robbery); *United States v. Craddock,* 993 F.2d 338, 342–43 (3d Cir. 1993) (employee's position was one that gave him the ability to commit the crime while avoiding routine auditing);[3] *United States v. Brelsford,* 982 F.2d 269, 272 (8th Cir.1992) (employee's position was as a teller supervisor, with special duties and privileges). *But see United States v. Ragland,* 72 F.3d 500, 502–03 (6th Cir.1996) (employee's position as customer service officer had no special discretion and was more like an ordinary bank teller); *United States v. Jackson,* 32 F.3d 1101, 1104–05 (7th Cir.1994) (employee's position as money market clerk did not appear to be other than an ordinary bank teller, but case remanded for exact determination). Intuition supports a feeling that all bank employees who handle money should be in the same position as postal workers, and should always be subject to the adjustment. Perhaps the Commission's restrictions on that intuition may seem a bit rebarbative. Nevertheless those restrictions exist, and as applied to this case they do not allow the two level upward adjustment for abuse of a position of trust.

The Guidelines have attempted to explicate the insight that people who violate a trust

---

3. Language in *Craddock* suggests that even an ordinary bank teller can be found to have breached his position of trust as a teller. *See 993*

F.2d at 343. If it is read that way, I simply disagree because that would be directly contrary to the Guidelines.

placed in them often do more damage to the social fabric and are more culpable than those who steal outright. That insight was no doubt universally grasped by sentencing judges before the Guidelines were even contemplated. However, it has been limited and somewhat obfuscated by the Guidelines themselves. That, in turn, has led to a legion of cases in the Courts of Appeals over the two point outcome of the abuse-of-a-position-of-trust alchemy.

In this case, Isaacson was trusted by her managers, but was not placed in a position of trust by her employer. Her managers have suffered for their failure to apply the safeguards that the bank had devised for a person in Isaacson's untrusted position. In fine, Isaacson was trusted by some, but was not in a position of trust.

Therefore, I most respectfully dissent.