UNITED STATES of America,
Plaintiff–Appellee,

v.

TECHNIC SERVICES, INC. and Rick
Rushing, Defendants–Appellants.

No. 01–30057.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 2002.

Filed Dec. 23, 2002.

Lawrence A. Pederson, Paul J. Nangle & Associates, Anchorage, AK, for the defendants-appellants.

James D. Oesterle, Special Assistant United States Attorney, Anchorage, AK, for the plaintiff-appellee.

Before: B. FLETCHER, ALARCÓN, and GRABER, Circuit Judges.

Opinion by Judge GRABER; Partial Dissent by Judge BETTY B. FLETCHER.

## OPINION

GRABER, Circuit Judge.

Defendants Rick Rushing and Technic Services, Inc. (TSI), appeal their convictions for violating the Clean Air Act and the Clean Water Act, as well as the related sentences imposed. We reverse Rushing's conviction on Count 8 for lack of evidence, but otherwise affirm the convictions. With respect to the sentences, we vacate the enhancement to Rushing's sentence for abuse of trust, but in all other respects reject Defendants' arguments.

## BACKGROUND

TSI is an Alaska corporation that performs asbestos-remediation services. At the relevant times, Rick Rushing served as its secretary/treasurer.

In 1995, TSI bid successfully on an asbestos-removal project at a pulp mill in Sitka, Alaska. The mill had closed in 1993 and was scheduled for demolition.

The project required asbestos removal in several buildings, but the trial focused mainly on activities in the powerhouse. The powerhouse was a large structure, containing several levels; drains in the basement floor led directly into Silver Bay, a navigable water of the United States. The powerhouse was in a state of disrepair. There were holes of all sizes in the walls and ceiling. TSI's primary contractual responsibility was to remove asbestos insulation on the pipes, boilers, and salvageable components at the mill.

TSI began work on the project in January 1996. After an inspection by the Occupational Safety and Health Administration and the Environmental Protection Agency (EPA), the project was stopped, or "red-tagged," temporarily in March 1996 because of noncompliance with regulatory standards. Soon thereafter the owner of the pulp mill hired Cle Wade to monitor

TSI's compliance with those standards. TSI finished removing asbestos from the powerhouse in January 1997. Wade then certified the building as clean.

After the March 1996 inspection of the project revealed apparent violations of regulatory standards, the EPA continued to investigate TSI's operation of the remediation project. One of the EPA's concerns was that TSI was washing waste-water, through the drains in the floor of the powerhouse's basement, into Silver Bay. In response to the investigation, the president of TSI, Gary Hitchings, sent a letter to the EPA explaining how TSI was complying with regulatory requirements. The letter stated that it was submitted for settlement purposes, and it invoked the protections of Federal Rule of Evidence 408. Enclosed with the letter was a statement, signed by 13 employees, asserting that TSI was not washing wastewater into the powerhouse drains.

In 1998, before the powerhouse was demolished, the EPA contacted Wade and asked him to take another look at one of the pipes in the powerhouse from which TSI was to have removed asbestos. Wade found that asbestos remained on the pipe, a finding that the EPA's lab tests confirmed.

The Government then initiated this criminal prosecution against TSI and Rushing. A grand jury returned a nine-count indictment. Count 1 charged both Defendants with violations of "one or more of the practices required under Title 40, Code of Federal Regulations, Section 61.145 and Section 61.150." Title 42 U.S.C. § 7413(c)(1) criminalizes violations of Clean Air Act regulations. Count 2 charged both Defendants with discharging pollutants into Silver Bay, a navigable water, without having obtained a permit for the discharge, in violation of 33 U.S.C. § 1311.

Counts 3 through 9 applied only to Rushing. Count 3 charged him with corruptly attempting to "influence, obstruct, or impede" inspection and enforcement proceedings before the Department of Labor and the EPA by "altering, concealing and deactivating" personal air-monitoring devices worn by workers, or by causing others to do so, in violation of 18 U.S.C. § 1505. Counts 4 through 9 charged additional violations of 18 U.S.C. § 1505, stemming from allegations that Rushing solicited employees to sign the false statement that TSI was not washing wastewater into Silver Bay.

A jury convicted both Defendants on all counts. After a hearing, the district court sentenced Rushing to 57 months' incarceration, to be followed by three years of supervised release. The court fined him $520,000 for the Clean Water Act violation. The court imposed a $600,000 fine on TSI, including $520,000 for the Clean Water Act violation, and sentenced it to five years' probation.

This timely appeal ensued.

## STANDARDS OF REVIEW

■ Claims of insufficient evidence are reviewed de novo. *United States v. Antonakeas*, 255 F.3d 714, 723 (9th Cir. 2001). Viewing the evidence in the light most favorable to the prosecution, we must determine whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Dipentino*, 242 F.3d 1090, 1096 (9th Cir.2001) (quoting *United States v. Shipsey*, 190 F.3d 1081, 1088 (9th Cir.1999)).

■ We also review de novo whether an indictment is multiplicitous. *United States v. McKittrick*, 142 F.3d 1170, 1176 (9th Cir.1998).

■ The district court's formulation of jury instructions is reviewed for abuse

of discretion. *United States v. Hicks,* 217 F.3d 1038, 1045 (9th Cir.), *cert. denied,* 531 U.S. 1037, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000). Whether a jury instruction adequately covers a defendant's proffered defense is reviewed de novo. *Id.* Claims of legal error in instructions are reviewed de novo. *United States v. Romo–Romo,* 246 F.3d 1272, 1274 (9th Cir.2001).

██ Likewise, we review for abuse of discretion the district court's decision to admit or exclude evidence. *United States v. Wright,* 215 F.3d 1020, 1025 (9th Cir.), *cert. denied,* 531 U.S. 969, 121 S.Ct. 406, 148 L.Ed.2d 313 (2000).

 With respect to sentencing, we review for abuse of discretion the district court's application of the sentencing guidelines to the facts. *Antonakeas,* 255 F.3d at 727. We review for clear error the district court's factual findings in the context of sentencing. *United States v. Frega,* 179 F.3d 793, 811 n. 22 (9th Cir.1999). Because it involves a mixed question of fact and law, we review de novo the district court's application of the abuse-of-trust enhancement. *United States v. Brickey,* 289 F.3d 1144, 1153 (9th Cir. 2002).

### DISCUSSION

Defendants bring numerous challenges to their convictions and sentences. We will organize our discussion of the convictions by count and then will turn to the sentencing issues.

### A. *Count 1*

Count 1 of the indictment charged:

On or about January 3, 1996, and continuing to on or about October 30, 1996, at Sitka, Alaska, within the District of Alaska, defendants TECHNIC SERVICES, INC. and RICK RUSHING, who were owners and/or operators at the time of the demolition project at the Alaska Pulp Corporation facility located in Sitka, Alaska, knowingly violated, and caused to be violated, work practice standards, by causing more than 160 square feet and/or 280 linear feet of RACM[1] to be stripped, removed, dislodged, cut, drilled, and disturbed without complying with one or more of the practices required under Title 40, Code of Federal Regulations, Section 61.145 and Section 61.150.

All in violation of Title 42, United States Code, Sections 7412(f)(4) and (h), and 7413(c)(1) and Title 18 United States Code, Section 2.

Paragraph 9 of the indictment specified precisely which work practices contained in 40 C.F.R. §§ 61.145 and 61.150 allegedly were violated and by what activities.

Title 42 U.S.C. § 7412 governs the establishment and enforcement of emission standards for pollutants. Section (f)(4) prohibits the release of air pollutants in violation of any applicable emission standard. 42 U.S.C. § 7412(f)(4). Section (h)(1) authorizes the Administrator of the EPA to promulgate "a design, equipment, work practice, or operational standard, or combination thereof," in lieu of an emission standard, if the Administrator concludes that it is unworkable to promulgate and enforce an emission standard for a particular pollutant. 42 U.S.C. § 7412(h)(1). For asbestos, the Administrator opted to promulgate work practice standards. 40 C.F.R. pt. 61, subpt. M. Title 40 C.F.R. § 61.145 provides the work practice standards for handling asbestos during "demolition and renovation" activities. Title 40 C.F.R. § 61.150 provides the work practice standards for disposal of asbestos waste materials.

Title 42 U.S.C. § 7413 outlines the various civil and criminal sanctions for viola-

---

**1.** "RACM" stands for "regulated asbestos- containing material."

tions of an emission standard or related regulations. Pertinent to this case, 42 U.S.C. § 7413(c)(1) provides:

> Any person who knowingly violates any requirement or prohibition of ... section 7412 of this title, ... including a requirement of any rule, order, waiver, or permit promulgated or approved under such sections or subchapters ... shall, upon conviction, be punished by a fine pursuant to Title 18, or by imprisonment for not to exceed 5 years, or both.

### 1. Count 1 as "duplicitous"

■ Defendants argue on appeal that the district court erred by not dismissing Count 1 of the indictment as duplicitous. But neither Defendant objected to Count 1, before trial, as duplicitous.

Federal Rule of Criminal Procedure 12(b)(2) requires a defendant to raise "challenges based on the alleged duplicity of an indictment" before trial. *United States v. Klinger*, 128 F.3d 705, 708 (9th Cir.1997). Otherwise, the defendant waives that challenge to the form of the indictment. *Id.*[2] Thus, Defendants waived their challenge, and we consider it no further.

### 2. Challenges to the sufficiency of the evidence

In two respects, Defendants challenge the sufficiency of the evidence to support their conviction on Count 1. Neither argument is well taken.

#### (a) Regulated asbestos

■ Defendants' first sufficiency challenge is that the evidence failed to show that the materials in question contained "more than 1 percent asbestos as determined using ... Polarized Light Microscopy." 40 C.F.R. § 61.141. We disagree.

At trial, there was testimony about the asbestos concentration of the pipe-insulation material in the powerhouse, from both before and after Defendants were working there. The samples were tested using polarized light microscopy, and the tests confirmed that the material contained from 40 to 60 percent amosite asbestos. That evidence was sufficient to allow a rational jury to find that Defendants were working with regulated asbestos.

#### (b) Visible emissions

■ Second, Defendants argue that there was insufficient evidence of "visible emissions to the outside air." By regulation, "visible emissions" are defined as "any emissions, which are visually detectable without the aid of instruments, coming from RACM or asbestos-containing waste material, or from any asbestos milling, manufacturing, or fabricating operation. This does not include condensed, uncombined water vapor." 40 C.F.R. § 61.141. "Outside air means the air outside buildings and structures, including, but not limited to, the air under a bridge or in an open ferry dock." *Id.*

Both testimonial and videotape evidence at trial provided the jury with sufficient evidence to convict Defendants. There was testimony that workers dropped asbestos-containing material from great heights, generating visible clouds of dust. Also in evidence was a videotape showing large clouds of visible dust caused by the workers' handling of asbestos-containing material. Employees testified that there were holes—some of them large—in the walls, ceiling, and doorways and that the building was not contained. The videotape also showed openings in the walls and ceiling of the powerhouse; some of the

---

**2.** Federal Rule of Criminal Procedure 12(f) states that "the court for cause shown may grant relief from the waiver" of objections to

defects in an indictment. Defendants do not argue that they had cause for failing to raise a duplicity objection.

openings were very close to where workers were creating visible clouds of dust. From this evidence, the jury was entitled to infer that the emissions that were visible inside the powerhouse escaped into the outside air and remained visible there. "Visible" means capable of being seen, Webster's 3d New Int'l Dictionary 2557 (unabridged ed.1993), not actually seen, so direct testimony that someone noticed asbestos emissions outdoors was not required.

### 3. Jury instructions

Defendants also claim that the district court erred by giving jury instructions 23 and 25 and by declining to give certain other instructions. We find no error.

#### (a) Instructions 23 and 25

 Defendants contend that jury instructions 23 and 25 "further the duplicitous nature of count 1" and misstate the applicable law. Neither Defendant objected to these jury instructions at trial. Thus, our review is for plain error. *Unit-*

---

*ed States v. Savage,* 67 F.3d 1435, 1439 (9th Cir.1995).[3] When reviewing for plain error, we "will reverse only if clear error prejudiced the defendant's substantial rights so as to affect seriously the fairness or integrity of the proceedings." *Id.*

 Even assuming that Count 1 was duplicitous because it charged violations of three separate work practice standards, instruction 25 remedied the problem by requiring all members of the jury to "agree[ ] as to which particular standard or standards were violated." *See United States v. Ramirez–Martinez,* 273 F.3d 903, 915 (9th Cir.2001) (stating that a duplicitous indictment can be cured by a specific unanimity instruction).

Defendants' argument that the instructions misstate the law, by referring to a regulation governing disposal of asbestos waste material, also fails to persuade us. The text of the instructions was taken directly from 40 C.F.R. §§ 61.145 and 61.150.[4] The latter regulation is entitled

---

**3.** Even when a defendant has waived a challenge to an indictment as duplicitous by not raising the objection in a timely manner, this court reviews for plain error the district court's failure to remedy a duplicitous count with a specific unanimity instruction. *Savage,* 67 F.3d at 1439.

**4.** Jury instruction 23 stated:
 The work practice standards for regulated asbestos-containing materials applicable to this case are as follows:
 (1) Each owner or operator of a demolition project must remove all regulated asbestos-containing material from a facility before any activity begins that would break up, dislodge, or similarly disturb asbestos material.
 (2) Before regulated asbestos-containing material is removed, it must first be adequately wet before cutting and stripping, then carefully lowered to the ground without dropping, throwing, sliding, or otherwise damaging or disturbing the material.
 (3) No visible emissions shall be discharged to the outside air during collection and handling operations and all regulated

asbestos-containing waste material must be kept adequately wet and be properly packaged for disposal in leak-tight containers.
 Title 40 C.F.R. § 61.145(c)(1) provides, in pertinent part, that "[e]ach owner or operator of a demolition ... activity ... shall ... [r]emove all RACM from a facility being demolished ... before any activity begins that would break up, dislodge, or similarly disturb the material."
 Title 40 C.F.R. § 61.145(c)(6) provides, in pertinent part:
 For all RACM, including material that has been removed or stripped:
 (i) Adequately wet the material and ensure that it remains wet until collected and contained or treated in preparation for disposal in accordance with 61.150; and
 (ii) Carefully lower the material to the ground and floor, not dropping, throwing, sliding, or otherwise damaging or disturbing the material.
 Title 40 C.F.R. § 61.150(a) provides that the owner or operator of a demolition activity shall "[d]ischarge no visible emissions to the

"Standard for waste disposal for manufacturing, fabricating, *demolition,* renovation, and spraying operations." 40 C.F.R. § 61.150 (emphasis added). It applies to "[e]ach owner or operator of any source covered under ... § 61.145." *Id.* In other words, the regulation governs the disposal of asbestos waste produced by and during demolition activity, as well as other kinds of disposal of asbestos waste.

 Finally, Defendants contend that these instructions were erroneous because 40 C.F.R. § 61.150(a) allowed them *either* to release no visible emissions to the outside air *or* to use other emission controls. Although they correctly describe the alternative methods of compliance, they neither requested an instruction of the kind now argued for nor presented any evidence that they used any of the approved methods specified by the applicable regulations. In the circumstances, the district court did not err by failing to instruct the jury on the alternatives to the visible emissions standard. *See United States v. Falsia,* 724 F.2d 1339, 1342 (9th Cir.1983) ("A defendant is not entitled to a jury instruction where there is no evidence to support it...").

(b) *Factors governing the promulgation of emission standards*

 Finally, Defendants argue that the district court erred when it refused to instruct the jury that the factors listed in 42 U.S.C. § 7412(d)(2) provided a defense to the alleged violation of the Clean Air Act. The district court did not err.

On its face, 42 U.S.C. § 7412(d)(2) does not provide a defense to a charge of criminally violating Clean Air Act work practice standards. The provision states:

Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which—

(A) reduce the volume of, or eliminate emissions of, such pollutants through process changes, substitution of materials or other modifications,

(B) enclose systems or processes to eliminate emissions,

(C) collect, capture or treat such pollutants when released from a process, stack, storage or fugitive emissions point,

(D) are design, equipment, work practice, or operational standards (including requirements for operator training or certification) as provided in subsection (h) of this section, or

(E) are a combination of the above.

None of the measures described in subparagraphs (A) through (D) shall, consistent with the provisions of section

---

outside air during the collection, processing (including incineration), packaging, or transporting of any asbestos-containing waste material generated by the source."

Title 61 C.F.R. § 61.150(a)(1)(iii) further directs an owner or operator of a demolition activity to "[a]dequately wet asbestos-containing waste material ... and [a]fter wetting, seal all asbestos-containing waste material in leak-tight containers while wet."

7414(c) of this title, in any way compromise any United States patent or United States trademark right, or any confidential business information, or any trade secret or any other intellectual property right.

That section is merely a list of factors that the EPA Administrator must take into account when *promulgating* "[e]missions standards applicable to new or existing sources of hazardous air pollutants." *Id.* The statute simply is irrelevant in the present context, so the district court properly declined to give the requested instruction. *See United States v. Duran,* 59 F.3d 938, 941 (9th Cir.1995) (stating that a defendant is entitled to an instruction on a defense theory " 'provided that it is supported by law and has some foundation in the evidence' " (quoting *United States v. Mason,* 902 F.2d 1434, 1438 (9th Cir. 1990))).

### 4. *Conclusion*

None of Defendants' arguments concerning Count 1 is well taken. We therefore affirm the convictions on Count 1.

### B. *Count 2*

■ Count 2 charged:

On or about January 3, 1996 and continuing to on or about April 15, 1996, at Sitka, Alaska, within the District of Alaska, defendants TECHNIC SERVICES, INC. and RICK RUSHING, knowingly discharged, or caused to be discharged, pollutants, namely a semiliquid waste slurry containing water, asbestos, surfactant and occasionally glycol (anti-freeze) through a point source, to Silver Bay, a navigable water of the United States, without having first obtained a permit for such discharge pursuant to the National Pollutant Discharge Elimination System, pursuant to Title 33, United States Code, Sections 1311(a) and 1319(c)(2)(A).

All in violation of Title 33, United States Code, Sections 1311(a) and 1319(c)(2)(A) and Title 18, United States Code, Section 2.

Title 33 U.S.C. § 1311(a) prohibits "the discharge of any pollutant by any person," subject to several exceptions. The only exception that is potentially applicable to this case is 33 U.S.C. § 1342(a), which authorizes the issuance of permits to discharge pollutants.[5] Title 33 U.S.C. § 1319(c)(2)(A) authorizes the imposition of criminal penalties on "[a]ny person who ... knowingly violates section § 1311." "Knowingly," in the context of § 1319(c)(2)(A), refers to the defendant's knowledge of the *acts* that constitute the offense, not to the defendant's knowledge of the legal violation. *United States v. Weitzenhoff,* 35 F.3d 1275, 1283–86 (9th Cir.1994). Therefore, to convict a defendant under § 1319(c)(2)(A) of a knowing violation of § 1311(a), the government must prove that the defendant knowingly discharged pollutants into navigable waters.

On appeal, Defendants raise three challenges to their convictions on Count 2. First, they argue that the conviction is invalid because there was an NPDES permit in place. Second, they contend that there is insufficient evidence that pollutants were discharged. Third, they argue that the court abused its discretion by not admitting into evidence a report regarding the asbestos content of wastewater samples taken from the pulp mill.

### 1. *NPDES permit*

■ Defendants assert that permits were in place and, therefore, that their

---

**5.** Title 33 U.S.C. § 1342 is entitled "National pollutant discharge elimination system." Accordingly, permits issued pursuant to that provision are known as NPDES permits.

conviction for knowingly discharging pollutants *without* having obtained a permit cannot stand. The factual premise for that assertion is absent.

Greg Kellogg of the EPA testified that, although the owner of the pulp mill had an NPDES permit for the discharge of pollutants, the permit remained in effect only until 1993 when the mill closed. Kellogg also testified that TSI itself had not obtained an NPDES permit. Finally, Kellogg testified that the general stormwater permit issued to the mill's owner did not cover a discharge of asbestos. In short, the evidence was undisputed that there was no current NPDES wastewater permit in place authorizing the discharge of pollutants and that the stormwater permit did not cover Defendants' activity.

■ Moreover, *Weitzenhoff* forecloses the argument that Defendants' *belief* (contrary to fact) that there was a proper permit defeats the "knowledge" element of 33 U.S.C. § 1319(c) (2)(A). Section 1319 allows criminal penalties "to be imposed on an individual who knowingly engages in conduct that [violates the statute or permit], regardless of whether the polluter is cognizant of the requirements or even the existence of the permit." *Weitzenhoff*, 35 F.3d at 1284. Accordingly, Defendants' belief that permits were in place is irrelevant to the determination of whether they knowingly engaged in conduct that violated § 1311.

### 2. *Evidence that pollutants were discharged*

■ Defendants next argue that there was no evidence that pollutants were contained in the waters discharged from the mill. They are wrong. There was ample evidence from which the jury reasonably could infer that pollutants were washed through the powerhouse drains into Silver Bay.

Kellogg identified "pollutants" for purposes of the Clean Water Act to include asbestos and the other items listed in Count 2 of the indictment. Peter Gorman, who had been an environmental consultant for the asbestos-removal project at the pulp mill, testified that Rushing was present at a pre-project meeting where there was a discussion about how all the drains at the mill led to Silver Bay. Victor Jones, a worker on the asbestos-removal project, saw asbestos going down the drains. He testified that Rushing told him not to worry about the asbestos that they were washing down the drains because "it'll go down to the bottom of the ocean—or bottom of the bay." Rodney Ange, another asbestos-removal worker at the powerhouse, testified that wastewater containing glycol and asbestos was "drained away" through the unfiltered drains in the basement of the powerhouse from January through March 1996. Roger Ihd, yet another worker on the project, said that workers washed asbestos "down the bay," even going so far as to remove filters to do it.

In short, there was sufficient evidence from which the jury could conclude that Defendants discharged a pollutant into Silver Bay through the drains of the pulp mill.

### 3. *Defendants' wastewater-sample results*

■ Last, Defendants argue that the district court abused its discretion when it declined to admit Defense Exhibit C, which consisted of three letters analyzing the asbestos content of wastewater samples taken on January 19, February 15, and March 18, 1996. The district court explained that it was refusing to admit the exhibit because Defendants had failed to establish a proper foundation. That conclusion is supported by the record.

Although there was evidence stating that the mill's owner conducted monthly sampling to maintain its stormwater permit, there was no evidence that the particular reports contained in Exhibit C were conducted for that purpose. Also, as the district court noted, there was no evidence of where or under what circumstances the samples were taken. On this record, the district court permissibly declined to admit Exhibit C.

### 4. Conclusion

We are not persuaded that the district court erred with respect to Count 2. Therefore, we affirm Defendants' convictions.

### C. Count 3

■ In order to convict a defendant of obstruction under 18 U.S.C. § 1505, the government must prove that there was "a proceeding pending before a department or agency of the United States." *United States v. Price*, 951 F.2d 1028, 1031 (9th Cir.1991). Rushing claims that there is insufficient evidence of a "federal proceeding" that could have been influenced by his now-conceded interference with workers' air-monitoring devices.

■ However, the record shows that TSI's conduct, while removing the asbestos at the pulp mill, was under investigation by the EPA at the relevant time. The EPA is, of course, an agency of the United States. 42 U.S.C. § 4321; Reorganization Plan No. 3 of 1970, 3 C.F.R. § 1072 (1966–70). An investigation into a possible violation of the Clean Air Act or Clean Water Act, which could lead to a civil or criminal proceeding, 42 U.S.C. § 7413(b), (c); 33 U.S.C. § 1319(b), (c), is a kind of proceeding, *see United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir.1976) (per curiam) ("An

administrative investigation is a 'proceeding' within the meaning of 18 U.S.C. § 1505.").

Rushing nevertheless contends that the EPA proceeding cannot count under 18 U.S.C. § 1505 because a state agency, not the EPA, was responsible for "employee exposure monitoring." Although it is true that the EPA does not monitor employees' exposure to asbestos fibers, that does not mean that Rushing's tampering with the personal air-monitoring devices could not obstruct the EPA's own proceedings. Armina Nolan of the EPA testified that EPA inspectors check air-monitoring results in order to determine the level of asbestos in the air at a work site. She testified that high levels of airborne asbestos fibers "might mean that [the workers] were not carefully handling the asbestos, or that the material was not adequately wetted." *See* 40 C.F.R. §§ 61.145(c) and 61.150(a) (stating work practice standards for handling asbestos). Furthermore, TSI itself relied on the low fiber counts registered by the personal air-monitoring devices as evidence that TSI was meeting *federal* work practice standards in its response[6] to the EPA's March 1996 inspection reports. In short, evidence of the EPA proceeding was sufficient to support Rushing's conviction for obstructing a federal proceeding by tampering with employees' air monitors.

### D. Counts 4 through 9

Counts 4 through 9, which charged Rushing with obstruction of federal proceedings, stemmed from his solicitation of the signatures of Frank Baines (Count 4), Reiko Phillips (Count 5), Roger Ihd (Count 6), Richard Biggs (Count 7), Ron Hildebrand, Sr. (Count 8), and Rodney Ange (Count 9) on a false statement to the EPA

---

**6.** Although TSI's response was "submitted pursuant to the protection of Federal Rule of Evidence 408," Defendants stipulated to the admission of Exhibit 2. See also discussion at p. 21, *infra.*

that TSI did not wash asbestos down the drains at the pulp mill.

Rushing challenges his convictions on Counts 4 through 9 on four grounds. First, he argues that district court erred by admitting the statement signed by the workers. Second, he alleges that there is insufficient evidence that Rushing was involved with the preparation of the statement that was submitted to the EPA. Third, he contends that the district court erred when it denied his motion to consolidate Counts 4 through 9. Fourth, he argues that there is insufficient evidence to support his conviction on Count 8 for soliciting the signature of Ron Hildebrand. We agree only with the fourth argument.

### 1. *The admissibility of Government Exhibit 2*

Rushing contends that the district court erred in admitting Exhibit 2 because the document was submitted to the EPA under the protections of Federal Rule of Evidence 408. Rushing's argument fails for two independently sufficient reasons.

 First, Rushing stipulated to the admission of Exhibit 2. In general, "[s]tipulations freely and voluntarily entered into in criminal trials are as binding and enforceable as those entered into in civil actions." *United States v. Gwaltney,* 790 F.2d 1378, 1386 (9th Cir.1986). Thus, a defendant who has stipulated to the admission of evidence cannot later complain about its admissibility. *Id.* Here, Rushing does not suggest that his stipulation was involuntary. Consequently, he cannot challenge the admission of Exhibit 2.

 Second, Federal Rule of Evidence 408 does not require the exclusion of evidence produced in the course of settlement negotiations if that evidence is "offered for another purpose, *such as* proving bias or prejudice of a witness, negativing a contention of undue delay, or *proving an effort to obstruct a criminal investigation* or prosecution." (Emphasis added.) Here, Exhibit 2 was introduced for "another purpose"—that of proving Rushing's obstruction of the EPA's investigation. The use of the phrase "such as" implies that the ensuing list is not exhaustive, but is only illustrative. *See, e.g., Brocklesby v. United States,* 767 F.2d 1288, 1292–93 (9th Cir. 1985) (holding that the district court properly admitted evidence of a settlement agreement under Rule 408 simply because the court admitted the agreement for "purposes ... distinct from proving liability," i.e., demonstrating the relationship between the parties and attacking the credibility of witnesses). Proving the criminal obstruction of an administrative investigation is a purpose "such as," or similar to, proving the obstruction of a criminal investigation. For that reason, Rule 408 does not render it inadmissible.

### 2. *Evidence of Rushing's involvement*

 Rushing argues that the evidence failed to show that he played a part in the preparation of Exhibit 2. To the contrary, Phillips, Biggs, and Ihd all testified that Rushing personally had solicited their signatures on the statement. According to Biggs, Rushing promised a $100,000 bonus for signing the false document. Their testimony, combined with Jones' testimony that Rushing was trying to get numerous workers to sign the letter while in a group setting in the lunchroom, permitted a reasonable finder of fact to infer that Rushing solicited the other signatures also.

### 3. *Motion to consolidate*

Before trial, Rushing moved to consolidate Counts 4 through 9 on the ground of multiplicity, that is, on the ground that they charge a single offense in more than one count. *United States v. Garlick,* 240 F.3d 789, 793–94 (9th Cir.2001). The district court denied the motion. We find no error.

"The test for multiplicity is whether each count 'requires proof of an additional fact which the other does not.' " *Id.* at 794 (quoting *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). An indictment is not multiplicitous merely because it charges more than one violation of the same statute based on related conduct; instead, a defendant can be convicted of multiple violations of the same statute if the conduct underlying each violation involves a separate and distinct act. *See, e.g., United States v. Vaughn,* 797 F.2d 1485, 1493 (9th Cir.1986) (stating that "[e]ach mailing in furtherance of the [mail fraud] scheme constitutes a separate violation" of the mail fraud statute); *United States v. Wiga,* 662 F.2d 1325, 1336–37 (9th Cir.1981) (holding that possession of firearms acquired at different times and places by a felon supported multiple convictions under felon-in-possession statute).

Here, each count of obstruction required proof of a separate and distinct act—that Rushing had solicited *the particular person* named in that count to sign the false statement. Consequently, the district court properly declined to consolidate the counts.

#### 4. *Count 8*

Finally, Rushing argues that there was insufficient evidence to convict him on Count 8 of the indictment, which accused him of obstruction by procuring Hildebrand's signature on the false statement. We agree.

The name "Ron Hildebrand" appears on the employees' false statement in Exhibit 2. Ron Hildebrand was a supervisor at the work site. However, there is no evidence that Hildebrand actually signed the document or that, if he did, Rushing played a part in soliciting his signature. No one identified the signature as Hildebrand's; no one testified that they had witnessed Hildebrand signing the document; and, even if Hildebrand did sign, there is no evidence of the circumstances under which he signed. Consequently, there is insufficient evidence to support Rushing's conviction on Count 8.[7]

#### 5. *Conclusion*

The Government presented insufficient evidence to support a conviction on Count 8. Accordingly, Rushing's conviction on that count is reversed. Rushing's other arguments do not persuade us; we affirm his convictions on Counts 4, 5, 6, 7, and 9.

### E. *Sentencing Issues*

Rushing disputes three aspects of his sentence that affect his term of imprisonment. After addressing those issues, we will consider the argument of both Defendants that the district court computed their fines incorrectly.

At the outset, we mention a preliminary issue raised by Rushing. He asserts that the sentencing enhancements required proof by clear and convincing evidence, citing *United States v. Jordan,* 256 F.3d 922, 926–27 (9th Cir.2001). Because the district court did not state expressly what standard of proof it was applying, Rushing reasons, the court may have erred by finding the facts supporting the sentencing factors only by a preponderance of the evidence.[8] The record belies that as-

---

7. Baines, Phillips, Ihd, Biggs, and Ange all testified at trial. They identified their signatures, explained that Rushing had asked them to sign, and acknowledged that the statement that they signed was false because, in fact, wastewater containing asbestos was being washed down the drains in the powerhouse.

8. Rushing does not argue that the district court *could* not have found the facts by clear

sertion. The court stated that it had "no doubt" that the enhancements for (1) repetitive discharges and (2) aggravated role in the offense applied. Similarly, the court said that Rushing "plainly" had violated a position of trust. Thus, the record reflects that the court found the enhancements by clear and convincing evidence.

We turn, then, to the legal questions that Rushing raises.

### 1. *Repetitive discharges*

Rushing objects to the district court's six-level upward adjustment of his offense level under United States Sentencing Guideline (U.S.S.G.) § 2Q1.2(b)(1)(A), which provides: "If the offense resulted in an ongoing, continuous, or repetitive discharge, release, or emission of a hazardous or toxic substance or pesticide into the environment, increase by 6 levels[.]" Application note 5 to that Guideline provides:

Subsection (b)(1) assumes a discharge or emission into the environment resulting in actual environmental contamination. A wide range of conduct, involving the handling of different quantities of materials with widely differing propensities, potentially is covered. Depending upon the harm resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation, a departure of up to two levels in either direction from the offense levels prescribed in these specific offense characteristics may be appropriate.

U.S.S.G. § 2Q1.2, cmt. n. 5.

In *United States v. Ferrin*, 994 F.2d 658, 663–64 (9th Cir.1993), we held that application note 5 requires a showing that some amount of a pollutant in fact contaminated the environment in order for the Guideline to apply. We defined "contaminate" as meaning " 'to soil, stain, or infect by contact or association' or 'to make ... impure by admixture.' " *Id.* at 664 (quoting Webster's New Collegiate Dictionary 245 (1977)). "Environment" means " 'surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States.' " *Id.* (quoting 42 U.S.C. § 9601(8)). We held that the Guideline did not apply because government authorities intervened and prevented the waste in question, which the defendant had left in a dumpster, from reaching the environment. *Id.* at 660.

At the same time, however, we have noted "that in most cases reasonable inferences from available evidence will suffice to support a conclusion that illegal acts resulted in contamination." *United States v. Van Loben Sels*, 198 F.3d 1161, 1165 (9th Cir.1999) (citing *Ferrin*, 994 F.2d at a 663–64), *amended*, 207 F.3d 1192 (9th Cir. 2000). In *Van Loben Sels*, we upheld the application of U.S.S.G. § 2Q1.2(b)(1)(A) when the evidence showed that the defendant had, on a continuing basis, discharged wastewater containing benzene into a city's sewer system. *Id.* at 1166. Evidence of the ongoing discharge supported an inference of actual contamination. *Id.*

 Here, the district court observed that the evidence at trial showed "that there were long periods of time when this facility, and in particular, the powerhouse, was not even close to contained for purposes of asbestos abatement." Those findings are not clearly erroneous. The trial testimony demonstrated that TSI regularly washed asbestos and other contaminants down the drains in the powerhouse and that those drains took the waste into Silver Bay. Even after TSI installed filters to prevent the asbestos from passing through

and convincing evidence, but only that it *did* not.

the drains, workers removed those filters to prevent water from backing up in the basement. The powerhouse was not contained, in that there were many holes in the walls and ceiling, and workers dropped—instead of lowering—asbestos material from great heights, conduct that caused asbestos to escape into the outside air. The district court did not err by upwardly adjusting Rushing's offense level under U.S.S.G. § 2Q1.2.

### 2. Aggravated role

 U.S.S.G. § 3B1.1(a) authorizes the court to increase a defendant's offense level by 4 levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Application note 1 clarifies that a " 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. n. 1. The district court found that the adjustment applied because Rushing led five or more people in the offense. Alternatively, it found that the offense was "otherwise extensive."

The record supports the finding that Rushing led five or more people in committing violations of the Clean Air Act. There was testimony that Rushing played an active leadership role in the practical aspects of the demolition. Ange and Jones, among other employees, testified that they "worked for" Rushing. Ihd testified that he and other workers dropped dry asbestos, in violation of work practice standards. Hammock testified that he and other workers did not adequately wet the asbestos, and dropped it, in violation of work practice standards. Phillips testified that workers did not adhere to work practice standards. Ange testified that he and other workers dropped asbestos. Jones likewise testified that he and other workers were not following work practice standards on the job. The testimony of those

five employees is sufficient to support the finding that Rushing was the leader of an endeavor involving five or more people who violated the Clean Air Act.

Because the application of U.S.S.G. § 3B1.1(a) is supported by evidence that Rushing was the leader of five or more participants in a criminal activity, we need not address whether his criminal activity was "otherwise extensive."

### 3. Position of trust

Rushing's final argument on the length of his prison term is that the district court erred when it enhanced his 27 offense level for abuse of a position of trust under U.S.S.G. § 3B1.3. That Guideline states that a defendant is eligible for a two-point enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." We hold that Rushing did not violate a position of public trust. Because the record is insufficient for us to determine whether the district court would have applied the enhancement solely on the ground that Rushing abused a private trust, we remand for resentencing.

#### (a) Public trust

"To support the abuse of trust enhancement, 'a *position* of trust ... must be established *from the perspective of the victim.*' " *Brickey,* 289 F.3d at 1154 (quoting *United States v. Hill,* 915 F.2d 502, 506 n. 3 (9th Cir.1990)) (emphasis added); *see also United States v. White,* 270 F.3d 356, 371 (6th Cir.2001) ("The abuse-of-trust enhancement may only be applied where the defendant abused a position of trust with the victim of his charged conduct."). In determining whether the enhancement applies, we have held that "the critical inquiry is the extent to which the position pro-

vides the freedom to commit a difficult-to-detect wrong." *United States v. Isaacson,* 155 F.3d 1083, 1086 (9th Cir.1998) (citations and internal quotation marks omitted).

■ Here, Rushing was charged with violating the Clean Water Act and the Clean Air Act and with obstructing agency proceedings. Because the Clean Water Act and the Clean Air Act are public welfare legislation, the victim of those offenses is the public. *See United States v. Hanousek,* 176 F.3d 1116, 1121 (9th Cir. 1999) (stating that the criminal provisions of the Clean Water Act are intended to protect the public at large from the dangers of water pollution); 42 U.S.C. § 7401(b)(1) (stating that the legislative purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population"). The victims of Rushing's obstruction offenses are the federal government, whose proceedings were obstructed, and the public, to the extent that the obstruction interfered with the enforcement of the Clean Air Act and Clean Water Act. Thus, in order for Rushing to be eligible for an enhancement for abuse of public trust, he must have been in a position of trust vis-a-vis the public or the federal government.

The record does not support a conclusion that Rushing held a position of trust with respect to either public victim. In *Brickey,* we held that the enhancement applied to a defendant whose victim was the government because the defendant's position as a government employee supported the conclusion that the defendant held a position of trust with the government. 289 F.3d at 1154–55. Similarly, in *White,* the Sixth Circuit concluded that the enhancement applied to a public employee who falsified water turbidity reports. 270 F.3d at 372–73. The court found that the victims of the defendant's offense were the members of the public residing in the defendant's water district, and the court concluded that the defendant held a quasi-fiduciary position—"a special trust relationship"—vis-a-vis those victims by virtue of his employment as a public officer "charged with protecting public health and safety." *Id.* at 373.

By contrast, in this case, Rushing had no trust relationship with the government by virtue of government employment; nor was he a public officer with a "special" or quasi-fiduciary relationship to particular members of the public because of duties to protect their health; nor did he hold a position in which the public directly delegates duties and places the public welfare in the incumbent's hands. *See United States v. Foreman,* 926 F.2d 792, 796 (9th Cir.1991) ("[P]olice officers are accorded public trust to enforce the law. The public, including fellow law enforcement agents, expect that police officers will not violate the laws they are charged with enforcing."). Rushing was, instead, the employee of a private company, hired to perform asbestos abatement.

We decline to find that Rushing's position as an employee of a private firm that was a government contractor is, without more, one on which the public relied.[9] To be sure, the public has an interest in having government contractors perform their work properly. However, it does not follow that every contractor enjoys a position

---

**9.** Contrary to the dissent's assertion, we do not "[i]n essence ... conclude[ ] that a private contractor may not enjoy a position of public trust." Dissent at 48. Rather, we hold that a person does not *per se* hold a position of public trust by virtue of his status as a private contractor and that, on this record, *this* private contractor did not hold such a position.

of public trust simply by force of the contract itself. The public has the same interest in having a contractor who sews Army uniforms, or who sweeps floors in a social security office, or who paints the fences surrounding a federal courthouse, follow the law in completing the assigned task. We do not think that the abuse-of-trust enhancement is meant to cover all government contractors.

Nor are we willing to hold that Rushing's position with a private firm holding a government contract warrants an "abuse of public trust" enhancement because the contract called for dangerous work, asbestos abatement. The importance of such work and its potential effect on public health heighten the amount of interest the public has in having Rushing follow the law, but those facts do not transform that kind of interest into the relational kind of interest that is required to find a position of public trust. Rushing was required to follow environmental and safety laws and regulations, and his failure to do so exposed him to criminal liability. But the public's expectation that Rushing would follow important laws, in itself, is not enough to trigger the "abuse of trust" enhancement.

We recognize that our holding conflicts with the First Circuit's recent decision in *United States v. Gonzalez–Alvarez*, 277 F.3d 73 (1st Cir.2002). The defendant in that case had obtained a required license from the Puerto Rico Department of Agriculture's Officina de Reglamentación de la Industria Lechera (ORIL), to produce milk. *Id.* at 75. The relevant regulations were extensive and were dedicated to en-

suring that only unadulterated milk, suitable for consumption, was sold. *Id.* at 76. The defendant was caught adulterating his product with weight-enhancing additives. He pleaded guilty to conspiracy to adulterate milk and to causing the delivery of adulterated food into interstate commerce. He received an "abuse of trust" enhancement under § 3B1.3, and he appealed. *Id.* at 75. The First Circuit said that it is "relevant to a § 3B1.3 inquiry whether the public expects that people in the position of the defendant will comply with health and safety regulations for which they are responsible." *Id.* at 81. The court then held that the "abuse of trust" enhancement properly applied to the defendant because "[t]he public was entitled to have dairy farmers like [the defendant] provide milk to processing plants compliant with all FDA and ORIL regulations, and accordingly we conclude that the defendant occupied a position of public trust." *Id.* at 81–82.

We are not persuaded by that approach. To put it simply, the public expects *everyone* to comply with applicable health and safety regulations. This expectation is codified in the substantive law that prohibits the violation of those regulations.[10] To hold that it is relevant that the public expects an individual to conform his or her behavior to the law provides no meaningful screen with which to filter out enhancement-eligible defendants. The abuse-of-trust enhancement would become applicable to nearly any defendant.

The fact that Rushing was licensed to perform asbestos abatement does not nec-

---

**10.** In some sense, all crimes involve a violation of the public trust. The statutory and Guidelines sentence for each crime already takes into account the importance that Congress places on adherence to the particular law that was violated. The enhancement for abuse of trust is designed to cover a much narrower class of crimes, as the application

notes explain. Thus, the enhancement is available for the bank president who embezzles $10,000, but not for the bank robber who comes in the front door with a gun and takes $10,000. Both steal the same amount of money from the bank, but only the bank president is eligible for the enhancement.

essarily transform his position into one of public trust, either. Licenses and certification requirements—which commonly are justified on grounds of public health and safety—cover many activities, including quite ordinary ones like driving a car.[11] Not every licensed activity is a position of public trust.

■ In fact, the requirement that a worker in Rushing's position be licensed points to the other, independent way that someone may be subjected to the § 3B1.3 enhancement: to "use[ ] a special skill, in a manner that significantly facilitate[s] the commission or concealment of the offense." Application note 3 explains that a "special skill" means "a skill not possessed by members of the general public and usually requiring substantial education, training *or licensing.*" U.S.S.G. § 3B1.3 cmt. n. 3 (emphasis added). Demolition experts and chemists are listed among the examples. *Id.* A license, then, is an indication that the licensee possesses a certain skill. Rushing's certification to engage in asbestos abatement is an indication that he possessed such a skill, and it appears that he had the expertise and opportunity to commit his crimes only because of this specialized skill.[12] His license renders him eligible for an enhancement under the "special skill" prong of the Guideline, but it does not transform his position into one of public trust.[13]

Rushing was a private contractor whose company signed an agreement with the government to clean up hazardous materials; he promised to do so in conformance with the Clean Air Act, Clean Water Act, and other regulations. Rushing broke that promise, and at the same time he broke a number of federal laws. He has been found criminally liable as a consequence. But there is nothing on which to rest a conclusion that Rushing occupied "a position of public . . . trust." An obligation to follow important laws that further the public health and safety cannot, merely by its own force, create a position of public trust. To hold otherwise would convert the enhancement into the general rule.

To summarize, our cases interpreting U.S.S.G. § 3B1.3 have held that the question whether a defendant has abused "a position of public trust" is analyzed from the perspective of the victim of the crime; when the victim is the public or the government, the defendant holds "a position of public trust" when the defendant is a government employee or exercises directly delegated public authority. The Guidelines also make clear that a fiduciary, such as a lawyer, occupies a position of trust. Rushing was none of those. His status as a private contractor performing hazardous work is not enough to place him in the narrow confines of the enhancement for abuse of public trust. He does possess a "special skill"—his license to abate asbes-

11. *Cf. Hess v. Pawloski,* 274 U.S. 352, 356, 47 S.Ct. 632, 71 L.Ed. 1091 (1927) ("In the public interest the State may make and enforce regulations reasonably calculated to promote care on the part of all, residents and non-residents alike, who use its highways.").

12. Alaska law provides that "[a] person may not be employed to abate an asbestos health hazard unless the person has been certified in a program approved by the Department of Labor and Workforce Development." Alaska Stat. § 18.31.200(c).

13. The district court enhanced Rushing's sentence under § 3B1.1 (Aggravated Role), so his sentence may not be further enhanced using the "special skill" theory under § 3B1.3. *See* U.S.S.G. § 3B1.3 ("[I]f this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1."). The district court may not avoid that result by recharacterizing a "special skill" as a "public trust."

tos—that supports application of U.S.S.G. § 3B1.3 but only in the absence of an "aggravating role" enhancement under U.S.S.G. § 3B1.1.

 At the very least, § 3B1.3—read in the light of Application Note 1—is truly ambiguous as to whether someone in Rushing's position is eligible for the abuse-of-public-trust enhancement. This Guideline is truly ambiguous because it fails to define what it means to hold a position of public trust and because that concept plausibly is open to the dissent's definition,[14] as well as the majority's. If the Guidelines are "truly ambiguous," it is appropriate to apply the rule of lenity. *See United States v. Gonzalez–Mendez*, 150 F.3d 1058, 1061 (9th Cir.1998) (stating that the court resorts to the rule of lenity only if a criminal statute is truly ambiguous); *United States v. Fuentes–Barahona*, 111 F.3d 651, 653 (9th Cir.1997) (per curiam) (holding that the rule of lenity applies to the Sentencing Guidelines as well as to penal statutes). "[T]he rule of lenity requires that we infer the rationale most favorable to [defendants] and construe the guidelines accordingly." *United States v. Martinez*, 946 F.2d 100, 102 (9th Cir.1991). Therefore, even if § 3B1.3 is ambiguous, rather than clearly inapplicable, as we believe it is, the abuse-of-public-trust enhancement cannot apply to Rushing.

The dissent's discussion conflates three distinct concepts contained in § 3B1.3 of the Guidelines, each of which separately can support an enhancement: abuse of a position of public trust, use of a special skill, and abuse of a position of private trust. For the reasons explained above, Rushing did not hold a position of public trust. He did use a special skill, but the district court's decision to enhance Rushing's sentence for his aggravated role in

the crime precluded application of a special-skill enhancement. Finally, Rushing held, and may have abused, a position of private trust, the issue to which we now turn.

### (b) *Private trust*

On the record before us, we cannot tell whether the district court intended to find that Rushing enjoyed a position of *private* trust with respect to his employees. The application notes explain that a position of trust is a position "characterized by professional or managerial discretion." U.S.S.G. § 3B1.3, cmt. n. 1. Rushing's position as secretary/treasurer of TSI satisfies that condition. The district court noted that Rushing had been convicted "as the responsible corporate officer" and found that Rushing was "supervising not just five but a whole crew of people." Some work site employees were new to asbestos-removal work, and all apparently relied on Rushing, as supervisor, to conduct the asbestos abatement in accordance with safety regulations.

 In this respect, Rushing held a position similar to that occupied by the defendants in *United States v. Turner*, 102 F.3d 1350 (4th Cir.1996). In that case, the defendants were the owners and operators of a private coal mine. They bribed a mine inspector to certify falsely that new miners had received required health and safety training. *Id.* at 1352–53. The defendants then pressured the miners, who never had received any training, to sign forms stating that they had received the required training. The miners understood that they would lose their jobs if they refused to sign the forms. *Id.* at 1353. The Fourth Circuit found that the defendants occupied positions of private trust, because they "regularly exercised manage-

---

14. *Hill*, on which the dissent relies heavily, dissent at 43–45, involved a position of private trust. Accordingly, that case does not assist us in divining the meaning of public trust.

rial discretion at the mine [and t]he miners, as employees of the [defendants], had to privately trust in them and defer to their judgment regarding mine safety and training." *Id.* at 1360.[15]

The asbestos workers operating under Rushing's supervision were positioned like the miners in *Turner.* He held a position of trust with respect to them.

The remaining question, then, is whether Rushing abused his position of private trust in the course of committing his crimes. There is reason in this record to think that he did. Rushing was convicted of, among other crimes, "altering, concealing and deactivating" personal air-monitoring devices worn by his workers, or causing others to do so. That conduct clearly placed the workers in jeopardy, and it arguably constituted a violation of Rushing's position of private trust. For the "abuse of trust" provision to apply, the position must also contribute in some significant way to the commission or concealment of the underlying offense. U.S.S.G. § 3B1.3, cmt. n. 1; *see also Isaacson,* 155 F.3d at 1086 (stating that the position must provide freedom to commit a wrong that is hard to detect). This condition might also be satisfied: It was Rushing's supervisory role (and his concomitant power to fire uncooperative employees) that allowed him to convince workers to state falsely that they were complying with abatement regulations and to manipulate the air-monitoring devices.

We cannot discern from the record below whether the district court would have found this conduct alone sufficient to warrant an "abuse of trust" enhancement on a

*private* trust theory, or whether its incorrect belief that Rushing held a position of *public* trust was necessary to its conclusion that the enhancement applied. We therefore remand to the district court for resentencing.

### 4. *Fine for the Clean Water Act violation*

The district court found that the "minimum fine under the Clean Water Act" was $520,000. It sentenced both Rushing and TSI to pay that amount. Defendants argue that the amount was incorrectly computed because there was no separate finding of how many days Defendants were in violation of the Clean Water Act.

Title 33 U.S.C. § 1319(c)(2) provides that knowing violations of the Clean Water Act "shall be punished by a fine of not less than $5,000 nor more than $50,000 per day of violation." That is, the minimum fine under the Clean Water Act is $5,000 per day of violation. Count 2 of the indictment charged Defendants with violations of the Clean Water Act from "[o]n or about January 3, 1996 and continuing to on or about April 15, 1996"—a total of 104 days. The jury found Defendants guilty as charged on Count 2. The jury therefore found that Defendants violated the Clean Water Act for 104 days;[16] $5,000 per day multiplied by 104 days equals $520,000—the minimum fine under the Clean Water Act for Defendants' offense. The district court correctly computed the fine.

### CONCLUSION

Rushing's conviction on Count 8 is REVERSED; all other convictions for both Defendants are AFFIRMED.

---

**15.** The Fourth Circuit also found that the mine owners occupied a position of *public* trust because "the rest of society had to publicly trust the [defendants] to follow the mine safety laws during operation of the ... mine." *Turner,* 102 F.3d at 1360. This reasoning appears to be identical to that employed by the

First Circuit in *United States v. Gonzalez–Alvarez,* 277 F.3d 73 (1st Cir.2002), and we decline to adopt it for the same reasons.

**16.** Defendants do not challenge the jury's finding of 104 days of violation.

TSI's sentence is AFFIRMED. Rushing's fine is AFFIRMED and his prison sentence is VACATED and REMANDED for reconsideration in the light of this opinion.

BETTY B. FLETCHER, Circuit Judge, dissenting in part:

I dissent in part because I disagree with the majority's holding that Rushing's sentence was improperly enhanced pursuant to U.S.S.G. § 3B1.3. The majority, in essence, decides that the fact that a defendant is an employee of a private company means that he or she does not hold a position of public trust and, alternatively, that the enhancement is ambiguous and therefore its application violates the rule of lenity. I disagree with both conclusions.

As I explain below, I find no legally sufficient ambiguity in the Guidelines, nor do our cases hold that the public or private character of a defendant's position controls whether he or she enjoys a public trust. See United States v. Hill, 915 F.2d 502, 505 (9th Cir.1990) ("Hill argues that truck driving is not the type of employment that can ever give rise to a position of public or private trust. We disagree."); accord United States v. Gordon, 61 F.3d 263, 269 (4th Cir.1995) ("The abuse of trust enhancement was not designed to turn on formalistic definitions of job type."). The fact that Rushing is not a government employee or public official, but an employee of a private company is not, as the majority suggests, dispositive of the question before us. Our precedents require, instead, that we look to the facts of the defendant's conduct and that we ask whether a position of public trust may be inferred from those facts. Id. Moreover, the majority would be mistaken even if our cases stood for the proposition that "Rushing's position as an employee of a private firm that was a government contractor is, without more," Opinion at 30, insufficient to support an enhancement, because there

is sufficient "more" in this case to uphold the district court's sentence.

I.

The facts fully support the conclusion that Rushing abused a public trust. Rick Rushing was not merely an employee of Technic Services, but also its secretary, treasurer, one of its two owners, and, at all times relevant to this case, its health and safety officer and its on-site supervisor. He directly supervised how Technic Service's employees conducted their asbestos remediation work at the Sitka pulp mill, and he, himself, personally participated in the remediation work. The work done under Rushing's direct and knowing supervision flagrantly violated federal and state asbestos work practice standards and resulted in repeated and significant releases of asbestos fibers into the open air and into Silver Bay. Rushing personally dropped substantial amounts of material containing asbestos from heights of 80 feet or more, releasing clouds of asbestos into the air.

The evidence also established that Rushing was directly responsible for monitoring asbestos air levels in the Sitka pulp mill for compliance with work safety standards set by federal and state law. The EPA did not directly monitor compliance, but entrusted that task to Technic Services. Rushing, as the company's health and safety officer and as its on-site supervisor, directly supervised the monitoring. Instead of monitoring asbestos levels accurately, Rushing instructed his employees to tamper with the company's air quality monitors. At his direction, Technic Service's employees deactivated the monitors and covered and cleaned their measuring cassettes. The tampering prevented accurate measurement of asbestos levels within the mill, and, although it was detected later, the tampering hindered the federal

investigation into the Clean Air Act and Clean Water Act violations at the site.

Both the State of Alaska and the federal government regulate asbestos abatement extensively as a hazard to human health. *See* 40 C.F.R. § 61.145, Alaska Stat. 18.31.200, Alaska Admin. Code tit. 18 § 61.610. In addition, Alaska has created a certification requirement that mandates that a "person may not be employed to abate an asbestos health hazard unless the person has been certified in a program approved by the Department of Labor and Workforce Development." Alaska Stat. 18.31.200(c). To become certified, an individual must receive at least forty hours of instruction in proper asbestos handling and in the health, safety, and environmental considerations of working with asbestos. Alaska Admin.Code tit. 18 § 61.700(a)(3). The instruction covers notification requirements for asbestos under federal and state law, proper asbestos spill response, asbestos emissions controls, proper asbestos disposal practices, and recognition of flaws in decontamination projects that could, inter alia, cause environmental contamination. *Id.* § 61.700(a), (b). Applicants for certification must pass written, practical, and oral examinations. *Id.* § 61.7100(a). Re-certification is necessary each year, *id.* § 61.720(c), and Alaska has discretion to revoke the certification of anyone who, inter alia, "is civilly fined or criminally convicted under the Clean Air Act." *Id.* § 61.750.

## II.

I turn first to the majority's contention that the rule of lenity bars the application of § 3B1.3 to Rushing because the provision is ambiguous because it fails to "define what it means to hold a position of public trust." Opinion at 34. I see no legal ambiguity[1] in the Guideline or the application note 2 either facially or as applied to Rushing. Section 3B1.3 provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase [the offense level] by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B.1 (Aggravating Role).

Application note 1, provides, in pertinent part, as follows:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion. (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's

---

1. Of course, *any* word in the English language may, in some sense, be considered ambiguous. However, such inherent "ambiguity" cannot be, and is not, the threshold for ambiguity that is legally material in the context of criminal law. *See Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991).

funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3 cmt. n. 1. To determine the meaning of a term in the Guidelines, we apply principles of statutory construction, and except in rare instances, we give terms their plain meaning.

The Guideline provides ample and sufficient guidance as to what "position of public trust" means. Application note 1 explains what positions might be positions of trust regardless of their public or private character. It does so by indicating a general hallmark of such positions (significant "professional or managerial" discretion) and gives *non-exhaustive* examples of positions that qualify for the enhancement. It also indicates two positions that do not qualify for the enhancement: ordinary bank tellers and hotel clerks. The application note, although it does not so specify, implies that the list of positions to which the enhancement does *not* apply is not exhaustive because the application of the enhancement is by reference to the factors delineated in the note and the Guideline.

The addition of the adjective "public" adds nothing legally ambiguous to the definition of "position of trust" in § 3B1.3. Under the usual canons of construction we give the adjective "public" its plain meaning: "of, relating to, or affecting the people as an organized community." *Web-*

*ster's Third New International Dictionary* 1836 (1993). Indeed, the majority implies that this is the correct understanding of the term "public" in the context of "positions of trust" when it holds (correctly, in my opinion) that the victims of Rushing's violations of the Clean Air Act, Clean Water Act, and obstruction charges are "the federal government . . . and the public." [2] Opinion at 1049. Moreover, in this case, there is no legal ambiguity as applied to Rushing, because his position, as I explain below, qualifies clearly as a position of public trust under the approaches defined by our case law.

But even assuming that there is some ambiguity in the Guideline, the Supreme Court requires more than mere debatable ambiguity for a court to conclude that a provision of federal criminal law is so ambiguous as to warrant application of the rule of lenity: The rule of lenity "is not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the Act, such that even after a court has seize[d] everything from which aid can be derived, it is still left with an ambiguous statute." *Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (alteration in original, internal quotation marks and citations omitted). There is no such ambiguity here.[3]

### III.

I turn now to the question of whether, under our case law, Rushing's position qualifies as one of public trust. I conclude that the district court was correct to enhance Rushing's sentence for an abuse of trust with respect to the public and the

---

**2.** The majority's position that we must consider the abuse of trust in this case from the perspective of the "public" as a victim, it should be noted, is inconsistent with its contention that the term "public trust" in the Guidelines is fatally ambiguous.

**3.** The mere fact that the members of this panel disagree as to the proper reach of § 3B1.3 does not create an ambiguity so as to warrant the application of the rule of lenity. Otherwise, *every* judicial disagreement would warrant applying the rule.

government based on the factors we enunciated in *United States v. Hill,* 915 F.2d 502 (9th Cir.1990), and because the public relied on Rushing to take the proper steps to abate the asbestos threat to public health and to the environment at the Sitka pulp mill. *See generally United States v. Foreman,* 926 F.2d 792, 796 (9th Cir.1990) (considering public reliance).

### A. The Hill Test

In *Hill,* we identified two indicia of whether a defendant enjoyed a position of trust sufficient to warrant an enhancement under § 3B1.3. We identified the pertinent questions as whether the defendant's "position provides freedom to commit a difficult-to-detect wrong," *Hill,* 915 F.2d at 506, and whether the defendant's activities were easily observed. *Id.; see also United States v. Cuff,* 999 F.2d 1396, 1397 (9th Cir.1993).[4] The plain rationale of *Hill* and its progeny is that "if one party is able to take criminal advantage of the relationship without fear of ready or quick notice by the second party, the second party has clearly placed a level of trust in the first." *Hill,* 915 F.2d at 506.[5] Thus, we embraced a pragmatic and fact-intensive inquiry under § 3B1.3 to determine whether an abuse of trust enhancement may be warranted. And we rejected an approach that elevates the form or designation of a defendant's job title over the underlying

facts that elucidate the defendant's relationship to the criminal conduct and to the victim. *Hill,* 915 F.2d at 506.

In this case, Rushing had substantial discretion over how Technic Services and its employees complied with the requirements for asbestos safety in the Sitka pulp mill.[6] The EPA did not directly monitor compliance with federal asbestos safety standards, but left substantial monitoring up to Technic Services and Rushing. Rushing's activities at the pulp mill were relatively unobserved by the public and the government, which directly entrusted him with the day-to-day monitoring of asbestos levels. Thus, Rushing's position satisfies the indicia of the *Hill* test.

Moreover, Rushing's position plainly satisfied the Guidelines' requirement that his position contribute to "making the detection of the offense or the defendant's responsibility for the offense more difficult." U.S.S.G. § 3B1.3, cmt. n. 1. Rushing tampered with and caused his employees to tamper with the monitoring devices he was entrusted with overseeing. His interference with the use of the devices plainly made the crimes at issue here more difficult to detect. And, as the facts that were before the district court amply demonstrate, Rushing not only felt free to take criminal advantage of his position, but blatantly indulged that freedom. Thus, from the perspective of both the general public

---

**4.** Contrary to the majority's assertion that our decision in *Hill* does not speak to abuses of public trust, I point out that we, and other courts of appeals, routinely have looked to the indicia identified in *Hill* in cases that involve abuses of public trust, *see, e.g., United States v. Robinson,* 198 F.3d 973 (D.C.Cir.2000); *United States v. Roberts,* 185 F.3d 1125 (10th Cir. 1999); *United States v. Ajiboye,* 961 F.2d 892 (9th Cir.1992), and I suggest merely that *Hill* provides an appropriate, if non-exclusive, framework for determining whether a public-trust enhancement is warranted.

**5.** Because these factors must be assessed from the point of view of the victims (here, the public and the federal government), it is not material if knowledge of Rushing's activities was widespread among or easily observed by Technic Services' other employees.

**6.** Of course, Rushing's discretion was limited by the requirements of federal and state laws regulating asbestos removal and abatement. But all discretion is limited by law, and the fact of such limitation does not compel the conclusion that Rushing did not enjoy substantial discretion over his own and Technic Service's compliance with the law.

in Alaska and the federal government, Rushing held a position of trust, and an enhancement pursuant to our precedents stemming from *Hill* was fully warranted.

### B. Asbestos Licensing

The district court also would have been correct to enhance Rushing's sentence pursuant to § 3B1.3 under a different rationale: that the public was entitled reasonably to rely on Rushing to see that the Sitka mill asbestos abatement was properly carried out because the State of Alaska requires *all* persons who do such work to be licensed to protect the health of individual workers and the public, and to prevent asbestos contamination of the environment. The record does not reveal whether Rushing held such a license as required by law. However, Rushing's possession *vel non* of such a license is not material to the question of whether the position he held was one of public trust. The requirement that all individuals who abate asbestos hazards in Alaska be licensed and the attributes of the licensing scheme itself indicate that the public, in Alaska, places substantial trust in individuals who do such work.

In order to protect the public health, safety, or welfare, a state may require a license for activities that require special expertise. The principle is firmly rooted that such licenses indicate a public trust that the licensee will perform the licensed activity properly. *See, e.g., Leduc v. Commonwealth*, 421 Mass. 433, 657 N.E.2d 755 (1995) (noting that public trust is extended to holders of barber's certificate of registration, medical licenses, or victualler's license); *Ulrich v. State ex rel. Bd. of Funeral Service*, 289 Mont. 407, 961 P.2d 126 (1998) (holder of mortician's license has position of public trust); *Natelson v. Dep't of Ins.*, 454 So.2d 31 (Fla.App. 1 Dist.1984) (insurance license); *see also* 51 Am.Jur.2d § 17 (licenses protect the public health, safety and welfare where license law "extends the public trust only to those with proven qualifications" or "protects the public from incompetence and dishonesty in those who provide the licensed service").

This principle applies most obviously to the learned professions, such as law or medicine. *See, e.g., Ross v. New York State Dep't of Health*, 640 N.Y.S.2d 359, 226 A.D.2d 863 (N.Y.App. Div. 3 Dep't. 1996) (medical license); *Committee on Legal Ethics of the West Virginia State Bar v. Moore*, 186 W.Va. 127, 411 S.E.2d 452 (1991) (license to practice law). But public trust is not *confined* to such professions, though if a licensed activity does *not* substantially affect public health, safety or welfare, courts are reluctant to infer that a licensing requirement indicates a public trust. *See, e.g., State v. Noles*, 1998 WL 754938 (Tenn.Crim.App. Oct.19, 1998) (possession of driver's license does not support sentencing enhancement for abuse of public trust).

But the fact that certain licenses do not evidence a public trust does not logically or legally invalidate the conclusion that in Alaska, asbestos abatement may carry such a trust. Indeed, a number of factors strongly support the conclusion that asbestos abatement *does* carry a public trust. First, asbestos abatement is plainly an activity that materially and substantially affects public health, safety, and welfare, and the Alaskan public has a compelling interest in preventing harm to people and to the environment from asbestos. Second, a clear purpose of Alaska's licensing requirement is to restrict abating and remedying asbestos hazards to trained individuals who have proven qualifications. And, third, the public is the beneficiary of the licensing requirement because it ensures that the public's interest in health and the environment will be protected. This is precisely the kind of license that evidences a public trust.

The conclusion that Alaska's licensing requirement indicates a public trust is con-

sonant with the more general principle that a number of circuits, including this one, have adopted: the reasonable reliance of the public on individuals to comply with laws they are charged with enforcing may support the inference that a defendant enjoys a position of trust. *See United States v. Gonzalez–Alvarez,* 277 F.3d 73, 81 (1st Cir.2002); *United States v. White,* 270 F.3d 356, 372–73 (6th Cir.2001); *United States v. Robinson,* 198 F.3d 973, 978 (D.C.Cir.2000); *United States v. Turner,* 102 F.3d 1350, 1360 (4th Cir.1996); *United States v. Brown,* 7 F.3d 1155, 1162 (5th Cir.1993); *United States v. Foreman,* 926 F.2d 792, 796 (9th Cir.1990). However, this case does not turn on the general principle of public reliance alone. Alaska's licensing requirements provide concrete and persuasive indicia that asbestos abatement work is work that carries a public trust.

Moreover, the fact that an Alaska asbestos abatement license requires particular skills is no bar to an enhancement for abuse of trust here. The district court did not enhance Rushing's sentence on the basis of the use of special skills.[7] The majority therefore does not contend seriously that the district court impermissibly "double counted" when it enhanced Rushing's sentence under § 3B1.3. The mere fact that an enhancement for use of special skills also might—or might not—have been an alternative basis for an enhancement has no logical bearing on whether the district court's chosen basis was appropriate.

### C. "More"

Finally, even if the majority were correct that an employee of a private firm, "without more," Opinion at 30, may not hold a public trust, this case presents additional factors that establish that Rushing held such a trust.[8] The EPA's direct entrustment of Rushing with monitoring asbestos levels at the pulp mill during Technic Service's work and Alaska's licensing requirement indicate that Rushing was not merely an employee of a private contractor.

### IV.

In essence, the majority concludes that a private contractor may not enjoy a position of public trust. The decision places the formalistic definition of Rushing's job over the plain reality that he enjoyed a considerable public trust in performing a task that is critical to public health and safety and to the enduring well-being of a delicate environment. Our precedents require us to look through the designation of a defendant's position to the defendant's conduct in relation to the victim of his crimes, and in this case, I believe, our cases fully support Rushing's sentencing enhancement. I would affirm the two-level enhancement applied by the district court.[9]

---

7. The special skills enhancement is meant to apply to defendants who use special skills in order to commit, facilitate, or conceal an offense. *See* U.S.S.G. § 3B1.3. But Rushing did not use special skills for handling asbestos safely in order to commit the Clean Air Act and Clean Water Act violations in this case. If anything, Rushing disregarded the information and skills required by Alaska's licensing requirements, and that disregard is the gravamen of the complaint against him.

8. I note that the majority provides no clue as to what might constitute the "more" that, under its reasoning, might be required.

9. The majority's decision to return this case to the district court to consider whether Rushing's sentence may be enhanced for abuse of a private trust is patently wrong. Public trust is what is at issue. The majority correctly recognizes that we examine whether there has been an abuse of trust from the perspec-

tive of the public and the government. The
trust at issue for the offenses of which Rush-
ing was convicted is public, not private.

